# IN RE EASTWOOD.

PATENTS; PATENTABILITY; ANTICIPATION; APPEAL AND ERROR.

1. While the skull-cracking or metal-breaking art and the art of transporting finished iron products are somewhat analogous, the combination of a skull or metal-cracking weight with a lifting magnet and a traveling crane is new, and the inventor of a device involving such a combination is entitled to a patent, where it appears that it is of great practical utility, and that although there are patents from ten to twenty-three years old covering the use of magnets for lifting articles and lifting cranes for metal-breaking devices, no one ever combined the two.

2. Where there is doubt as to whether or not an applicant's invention is patentable, the doubt will be resolved in his favor. (Following *Re Thompson*, 26 App. D. C. 425.)

3. The facts of each case must control the determination of whether there is patentable novelty in an invention.

No. 539.   Patent Appeals.   Submitted March 9, 1909.   Decided April 19, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents denying an application for a patent. *Reversed in part and affirmed in part.*

The facts are stated in the opinion.

*Mr. William L. Pierce* for the appellant.

*Mr. Webster S. Ruckman* for the Commissioner of Patents.

Mr. Justice ROBB delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner of Patents denying appellant's application for the grant of a patent for "improvements in apparatus for breaking and transporting iron products," the ground for the ruling being that the claims do not involve patentable novelty over the prior art.

We reproduce the appellant's description of his invention as set forth in his specification:

"My invention relates to a new and useful combination of devices for breaking up and handling products of iron or steel which it is desired to remelt or otherwise treat. These products may be in the form of skulls, as they are called, which are composed of steel or iron which accumulates on the inner lining of ladles which have been filled with the molten metal, castings which have come from the sand in imperfect condition, worn out machinery which has been scrapped, etc.

"In the past this material has been broken up by what is commonly known as a skull cracker, which consists of a tripod

50 to 75 feet high, arranged at the top of the structure with a sheave, over which passes a hoisting cable. The free end of the cable is provided with a hook which may be tripped by means of a rope. This hook engages an eye in a heavy weight which is hoisted by means of a suitable engine attached to the cable. When the weight has reached the requisite height, it is tripped by the operator, who pulls the rope attached to the hook. The weight is thus released and falls on the casting or other scrap, which is thereby broken. This is a very slow and expensive process, as the tripod is stationary, and the point at which the weight may strike is therefore a fixed point. The aim of the weight is also frequently destroyed by the pull on the rope required to release the trip. Frequently, also, the weight in striking will roll over in such a way that the hook or eye in the weight will not be in an accessible position for attaching the hook again, necessitating the work of several men to turn over the weight so that the hook may be attached. Inasmuch as weight as high as 20,000 pounds are frequently employed, this becomes a very tedious and expensive matter. Further, when the castings have been broken up, the broken pieces are usually gathered up by hand and loaded into cars. My device may be used to break articles of any nature, whether of magnetic material or not, or to drop weights for other purposes than the breaking of articles.

"With any improved apparatus when used in its preferable form, all hand work is eliminated in handling the scrap and placing it at the proper point, in attaching the weight to the hoist, in releasing the weight from the hoist to cause it to drop, and in gathering up the broken pieces and reloading them into suitable cars or receptacles. The weight is released in such a manner that there is no tendency to destroy its aim by causing it to swing. A single operator can conveniently operate the entire apparatus with convenience and dispatch, and a number of men are dispensed with in what may be considered a very dangerous occupation, inasmuch as accidents due to flying pieces of metal are very numerous with the ordinary form of skull cracker now in use.

"My arrangement consists, in its preferable form, of an overhead crane, traveling upon a runway of suitable height, and being preferably of standard form, permits free motion in three directions, namely, the bridge of the crane travels horizontally along the runway, the trolley which carries the hoisting mechanism travels horizontally on the bridge of the crane transversely of the direction of travel of the bridge, and the hook attached to the hoisting cables or chains, of course, travels vertically. By this arrangement the hoist of the crane covers practically all of the space under the runway.

"I attach to the hook of the crane an electro-magnet, preferably of the form described in United States Patent No. 794,-086 issued to me July 4, 1905. This magnet is used for unloading the scrap or casting from the railroad cars and suitably placing them on the ground. The weight which I employ for breaking the castings is preferably spherical in shape, and being thus symmetrical, it makes no difference whether or not it turns over or rolls to one side, as it always represents a face of the same contour to the poles of the magnet.

"The magnet which I prefer to use is concave on its lower face and therefore adapted to engage with spherical surfaces. The crane is equipped with a flexible electrical cable for conveying current to the magnet as it is moved about by the crane, and the operator is provided with a switch by means of which the magnetizing circuit of the magnet may be closed aand opened. The magnet is lowered upon the weight, the circuit closed, the weight hoisted slightly and the crane so moved that the weight is poised directly over the metal which it is desired to strike. The weight is then hoisted vertically to its full height and the circuit of the magnet is opened. The weight is instantly released and drops down upon the metal to be broken. After the scrap or castings are broken, the magnet is used for gathering up the broken pieces and loading them into cars. The operator is at such a height above the ground that in ordinary cases he is not exposed to the danger of flying pieces of metal, and, in any event, he can readily be protected by placing suitable screens around his cab.

"It will readily be understood that, by the arrangement above described, a large amount of labor which is necessary with other devices is dispensed with, and, at the same time, the risk of accident to workmen is very materially reduced.

"The form of crane which I have above described is preferable for the work. However, what is known as a Gantry crane could be used, which has a suitable bridge member carried by suitable shear legs, which are provided with trucks, and run upon rails on the ground. The bridge member, of course, is provided with the usual trolley, which carries the hoisting mechanism across the bridge. A swinging or jib crane can also be used for the purposes described, and the magnet could, with considerable advantage, also be applied to the stationary form of tripod skull cracker."

The claims forming the subject-matter of the appeal are as follows:

"1. In combination in a device for breaking articles below the same, drop weight to break the articles, a hoisting device, a magnet attached to said hoisting device, and adapted to lift said weight upon actuation of the hoisting device a sufficient distance to cause the weight, when released, to fall upon and break said articles, and means for causing said magnet to release said weight.

"2. In combination, a drop weight, a magnet adapted to lift said weight a sufficient distance to cause the weight, when released, to fall upon and break an article below the same, a traveler to move said magnet horizontally, and means for causing said magnet to release said weight.

"3. In combination, an electro-magnet having a concave lifting face and a drop weight adapted to be received by said concave face.

"4. In combination, an electro-magnet having a concave lifting face, and a spherical drop weight to be received by said concave face.

"5. In an apparatus for breaking and transporting magnetic products, a traveler having horizontal movement, a hoisting device thereon, an electro-magnet attached to the hoisting device,

and adapted to attract to itself magnetic articles to be transport-
ed to a convenient place to be broken, and to be carried away
after they have been broken, a drop weight adapted to be lifted
by said magnet and hoisting device, and released so as to fall
upon said articles and break the same." .

It is conceded by the appellant that the several elements he
has brought into co-operation in his structure are old; but he
earnesly contends that the combination of these old elements
performs a new and useful function, and that the bringing about
of this result involved something more than mere mechanical
ability. On the other hand, it is contended by the Patent Of-
fice that appellant has done nothing more than apply an old
device, without material change, to a new but analogous use,
and hence that he is not entitled to a patent.

We will here consider the references relied upon by the Com-
missioner as anticipating appellant's structure, and as war-
ranting the rejection of his claims. The patent to Wenrich,
April 18, 1882, No. 256,777, shows the metal breaker or skull
cracker of the prior art. It consists of a stationary tower in
which there is a vertical shaft, at the lower end of which is a
trip hook to which the drop weight is attached. This device dif-
fers from the Eastwood device in that a catch instead of a mag-
net attached to the hoisting device is used to hold the weight,
and in the further fact that no traveler for moving the weight
horizontally is shown. In the Wenrich device it is apparent
that the metal upon which the weight is to fall must be as-
sembled directly under the weight, the weight having no lateral
motion. It is also apparent that when the weight falls, owing
to the tremendous velocity it attains, it must frequently get
out of alignment and require the effort of several men to bring
the eye into co-operation with the trip hook of the shaft. To
be sure, Wenrich shows a lever provided with grapples and
susceptible of being operated on a pivot inserted in one of
the braces or horizontal supports at the lower end of and con-
necting two of the legs of the tower; but it is apparent that this
lever will not perform the function claimed for it. It is operat-

ed by hand, and would be incapable of moving a ball weighing thousands of pounds. This reference is the only reference in the metal breaking or skull cracker art.

The Wellman patent, December 10, 1905, No. 551,020, shows the ordinary overhead traveling crane forming one of the elements of appellant's combination. To this crane is attached an electro-magnet, and the object of the invention, as stated by the inventor in his specification, is "to so construct an electro-magnet that it can be utilized for lifting large pieces or sheets of metal, and, when combined with a crane, to dispense entirely with the claws or chains usually employed." In other words, the object of this invention was to utilize an electro-magnet in moving and loading upon cars, etc., pieces of metal.

The third and last reference is the patent to Eastwood, July 4, 1905, No. 794,086, and shows a magnet for the form mentioned in appellant's present application.

The affidavits of two witnesses were filed in support of the application. One is by Eugene B. Clark, who for ten years has been connected with the South Works of the Illinois Steel Company; about seven years as electrical engineer, and about three years as assistant general superintendent. He states in his affidavit that he has several times experimented with electro-magnets for lifting and transporting steel plates, etc., and that two patents have been issued to him for improvements thereon; that during his ten years connection with the Illinois Steel Company lifting magnets have been constantly in use for lifting and transporting, in connection with cranes and conveyors, steel products; that notwithstanding such use it has not occurred to him or to anyone connected with the Steel Works to make use of an electro-magnet for readily attaching a drop weight to the hoisting rope of the crane or other lifting device, and permitting it to drop upon the castings or other objects to be broken; and that he does not consider the combination of an electro-magnet with a suitable drop weight, and means for hoisting the magnet and weight, as one that would readily occur to those skilled in the art. He further says that, from his experience with mechanically operated skull crackers of the old construction, he

can say positively that the device of the application is one of great practical utility.

The affidavit of George W. Burrell is to the effect that he is assistant works manager of the Wellman-Seaver-Morgan Company, of Cleveland, Ohio, and that he has used the combination of the application in breaking up metal, and that the process is thereby carried on much more cheaply and expeditiously than under the prior art; and that he can "attest to the value and utility of the invention."

The utility of the Wellman structure, which is used in transporting metal, being fully demonstrated, we think the affidavits of Clark and Burrell sufficient to demonstrate the great utility of appellant's device. Indeed, leaving entirely out of view the Clark and Burrell affidavits, we think the references settle the question of utility in appellant's favor. In his device the weight contains no staple or eye, and may be grappled by the electro-magnet in any position, and within quite a wide radius, and released when desired with great precision. After the breaking up of the metal has been accomplished the weight can be put to one side by the use of the electro-magnet, and the broken fragments gathered up. It is true that in doing this particular work the electro-magnet would be performing the exact function it performs in the Wellman patent, but the fact that appellant has combined the Wellman device with other devices, and has left the Wellman device so that, by merely detaching one element of the combination, that device will still perform its ordinary functions, ought, we think, to be given weight on the question of the utility of the combination.

The Patent Office takes the position that one possessing the general knowledge of the use of a magnet to lift articles would easily see that he might lift a drop weight as well with a magnet. This contention is met, however, by the affidavits of Clark and Burrell and by the dates of the references. Wellman's patent, covering the use of electro-magnets for lifting articles, had been in force for ten years, while Wenrich's patent on a skull cracker had been granted twenty-three years. If this was such an obvious thing to anyone having a knowledge of the use to which

electro-magnets had been put, it is somewhat remarkable, considering the utility and apparent demand for this device, that no one should have thought it worth while to construct it. While the skull-cracking art and the art of transporting finished iron products are somewhat analogous, it must be held, in view of the evidence in this record, that the combination of a metal or skull-cracking weight with a lifting magnet and a traveling crane is new.

We are not unmindful that, to be patentable, the combination must be productive of a different result in the combined elements from that given by their separate parts. In other words, that the union of separate elements must produce something new. *Reckendorfer* v. *Faber,* 92 U. S. 347, 23 L. ed. 719. In that case it was attempted to sustain a patent on a lead pencil with a piece of India rubber or other erasing material inserted in the recessed end of the pencil. The court said: "A handle in common, a joint handle, does not create a new or combined operation. The handle for the pencil does not create or aid the handle for the eraser. The handle for the eraser does not create or aid the handle for the pencil. * * * An instrument or manufacture which is the result of mechanical skill merely is not patentable. Mechanical skill is one thing; invention is a different thing." After giving an illustration of a combination producing a new result, the court said: "A double effect is produced or a double duty performed by the combined result. In these and numerous like cases the parts co-operate in producing the final effect, sometimes simultaneously, sometimes successively. The result comes from the combined effect of the several parts, not simply from the separate action of each, and is, therefore, patentable." It was held, however, that the patent in issue was void; Mr. Justice Strong, Mr. Justice Davis, and Mr. Justice Bradley dissenting. Surely, if the court considered the question whether the idea of inserting a piece of rubber in the end of a pencil was patentable, we think it, at least, a doubtful question whether appellant's discovery is not patentable, and in such cases it has been the policy of this court to resolve the

doubt in favor of the applicant. *Re Thompson,* 26 App. D. C. 425. The lifting crane and the electro-magnet were designed and used for a different purpose than that to which appellant 'applies them. To bring about the result he has achieved it was necessary to combine them with another element, namely, the metal-cracking weight. This fact is important. *Worswick Mfg. Co.* v. *Steiger,* 17 Fed. 250. The three elements in the combination, each co-operating with the other, produce a result absolutely new to either. "It is not sufficient," says Mr. Justice Brown, in *Topliff* v. *Topliff,* 145 U. S. 161, 36 L. ed. 661, 12 Sup. Ct. Rep. 825, "to constitute an anticipation, that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions."

It is a general rule that, if a new combination and arrangement of known elements is productive of a new and useful result, it is evidence of invention. *Webster Loom Co.* v. *Higgins,* 105 U. S. 580, 26 L. ed. 1177. And the argument advanced, after the combination has been effected and the new result obtained, that anyone could have done the same thing, ought not to receive great consideration in a case like this, where ten years elapsed before the combination became an accomplished fact. Especially is this true when a material advance has been made in the art involved. Neither are we impressed with the argument that, because of the grant of a patent to appellant, no one possessing the right to use the lifting device of Wellman could use it as a skull cracker. The obvious answer to this argument is that Wellman's device was neither designed for, nor used, as a skull cracker. Indeed, without the co-operation of the weight it could not be used for that purpose.

*C. & A. Potts & Co.* v. *Creager,* 155 U. S. 597, 39 L. ed. 275, 15 Sup. Ct. Rep. 194, involved a patent covering a machine to disintegrate clay. The patent principally relied upon as anticipating the Potts patent was the one upon the device known as the "Creager wood-polishing machine." In that device there was a cylinder provided on its periphery with a series of

projecting strips or bars of glass, not materially differing in form from the scrapers on the Potts device. The Creager machine, however, was used for polishing boards. The court said: "Had this machine been used for an analogous purpose, it would evidently have been an anticipation of the Potts cylinder, since the substitution of steel for glass strips would not of itself have involved invention. * * * When a patented device is a mere improvement upon an existing machine, and the case is not complicated by other anticipating devices, the solution is ordinarily free from difficulty. But where the alleged novelty consists in transferring a device from one branch of industry to another, the answer depends upon a variety of considerations. In such cases we are bound to inquire into the remoteness of relationship of the two industries, what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogus to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to require clearer proof of the exercise of the inventive faculty in adapting it to the new use; particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry but remotely allied to the other, *and the effect of such transfer has been to supersede other methods of doing the same work,* the court will look with a less critical eye upon the means employed in making the transfer. Doubtless a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him; but the person who has taken his device, and, by improvements thereon, has adapted it to a different industry, may also draw to himself the quality of inventor." In this case the inventor has taken Wenrich's device and combined it with that of Wellman, and has thereby produced a structure that will undoubtedly completely displace and supersede the device of the prior art. He has taken the cumbersome and expensively operated device of the prior art, and, by combining it with other devices in other arts, has added greatly to its efficiency, and at the same time materially reduced

the cost of its operation. He has in fact as well as in law produced a new device, and it seems to us that the spirit and purpose of the patent laws will be subserved by the grant of a patent to him for achieving this result. If the discovery was a trivial one, following closely the issuance of patents upon the elements of the combinations, we would view the case with less liberality; which is equivalent to saying that the facts of each case must control the decision upon the application.

Claims 3 and 4 include merely the form of the magnet disclosed in the prior Eastwood patent. If that patent is valid, appellant will be fully protected by the allowance of claims 1, 2, and 5. If it is invalid, it will add nothing to his protection to include claims 3 and 4 here.

For the reasons stated it is our opinion that the Commissioner erred in rejecting claims 1, 2, and 5, and his decision to that extent is reversed; and the clerk of this court will certify this opinion and the proceedings in this court to the Commissioner of Patents, as required by law.                    *Reversed.*