**THE MATHIESON ALKALI WORKS, Inc.,**
**v. COE, Com'r of Patents.**

**No. 6999.**

United States Court of Appeals for the District of Columbia.

Decided Sept. 26, 1938.

Clarence M. Fisher, of Washington, D. C., and Leslie B. Young and Raymond F. Adams, both of New York City, for appellant.

R. F. Whitehead, Solicitor, U. S. Patent Office, Washington, D. C., for appellee.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

MILLER, Associate Justice.

This is an appeal from a decree dismissing a bill brought under the provisions of Section 4915, R.S., 35 U.S.C.A. § 63. The bill was based upon an application of Taylor and White which contained twenty-nine claims, all but six of which were withdrawn at the trial. Appellant sued as assignee of Taylor and White. Claim 31, broader in its terms than any of the others, reads as

follows: "31. In bleaching cellulosic material, the improvement which comprises subjecting the cellulosic material to treatment with an acid aqueous solution containing a chlorite of a metal of the class comprising the alkali metals and the alkaline earth metals without destructive action on the cellulosic material." The lower court held that it was not invention, in view of the prior art, to use a chlorite as a bleaching agent in bleaching cellulosic material, and that the claims involved in this suit define no invention over the prior art.

The lower court and the Commissioner relied upon a number of references, i. e., United States Patents: Trostel, No. 1,-409,799, March 14, 1922; Mathesius et al., No. 1,061,392, May 13, 1913; Drewsen, No. 1,283,113, October 29, 1918; Rue, No. 1,-771,064, July 22, 1930. British Patents: Watt, No. 893 of 1854; Clark, No. 2,987 of 1865; and upon 2 Mellor, Inorganic & Theoretical Chemistry (1922) 284. They took the position that disclosures in these references, whether known or unknown by the applicants, were sufficient to inform them that the prior art taught the use of chlorites for bleaching purposes. Appellant, on the other hand, contends that while hypochlorites were used by the industry for bleaching purposes, chlorites were not so used; that the discovery of their practicability for this purpose resulted from experiments which flew directly in the face of the teaching of the prior art; that the industrial practicability of chlorites for pulp bleaching depended upon their use in combination with ancillary acids, which acids, when used in connection with hypochlorites, degenerated the cellulosic material, but which, when used in connection with chlorites, produced good bleaching without deterioration of the cellulosic fibre—a chemical miracle previously unknown to science and to the industry, hence, not taught by the prior art. The evidence supports appellant's contention.

The type of bleaching involved in the industrial processing of cellulosic pulp is oxidation—bringing oxygen into contact with the pulp, the oxygen converting the colored material into a colorless substance or into a readily soluble material which washes out. Depending on the other elements with which it is associated and the proportions of that association, oxygen may be active or inactive for bleaching purposes. Moreover, the chemical properties of the material to be bleached are also important.

Thus, one oxidizing agent may be effective in bleaching cellulosic material such as cotton and another in bleaching wool; while if the first is used on wool or the second on cotton they will be ineffective. For this reason, therefore, the lower court's finding that the British patent to Clark discloses a process of bleaching feathers, in which it is stated that chlorites may be so used, is irrelevant to the present issue. The reference discloses that the bleaching agent preferred by Clark was a weak solution of azotic acid which contains chromate or bichromate of potash; chlorites being mentioned generally, among many other bleaching agents, including "all kinds of salts and oxygenated or other acids". The reference discloses nothing concerning the bleaching of cellulosic materials, and discloses nothing concerning the different reactions of chlorites and hypochlorites in an acid solution.

One of the findings of the lower court states that the patents to Mathesius, Drewsen and Rue disclose processes for bleaching pulp, using a hypochlorite under acid conditions. The finding is correct so far as concerns the patent to Drewsen. In the Rue patent neither hypochlorites nor chlorites are mentioned. In the Mathesius patent, *successive* alkaline, hypochlorite and acid treatments are described. However, and of greatest importance, it must be noted that, so far as concerns all of these three references, (1) no suggestion is made, in any of them, of the use of chlorites; (2) in none of them is anything taught concerning the different reactions of hypochlorites and chlorites when used in acid solutions; and (3) warning is given in the Mathesius patent that the acid, when used following the hypochlorite treatment, is dangerous to the fabric.

It was well known to the prior art that when a hypochlorite is acidified it is a very effective bleaching agent, but as disclosed by Mathesius, it was also well known that it was highly destructive of the cellulose itself. For this reason hypochlorites were used by the industry in a slightly alkaline condition. In this condition the available oxygen was sufficiently active to get a rapid bleach, and while it was somewhat destructive of cellulose, that was something to which the industry had perforce become reconciled, because prior to Taylor and White's discovery, it knew no better method. But it had learned, definitely, that hypochlorites in combination with acids were industrially impracticable as bleaching agents, because in that form they were even more destructive of the cellulose.

The Mathesius, Drewsen and Rue patents, therefore, far from showing that the prior art taught the process claimed by appellant, instead support appellant's contention that the prior art taught the destructive effect of hypochlorites and acid when used in combination. Moreover, they indicate, as appellant contends, that the protective effect, procurable by the use of chlorites and acid in combination for bleaching, was entirely unknown to the prior art.

In his brief the Commissioner states that the British patents and Mellor's treatise "were cited as showing statements that a chlorite has bleaching qualities." There is no dispute upon this point. The bleaching properties of several chlorine acids and their salts have been long and well known. This includes hypochlorites, the salts of hypochlorous acid; chlorites, the salts of chlorous acid; chlorates, the salts of chloric acid; and perchlorates, the salts of perchloric acid. One of the common forms of these salts is a combination of sodium, chlorine and oxygen; expressed in the following formulæ: Hypochlorite, $NaClO$; chlorite, $NaClO_2$; chlorate, $NaClO_3$; perchlorate, $NaClO_4$. It will be observed that in each formula there is one atom each of sodium and chlorine, but the atoms of oxygen increase from one to four. Strange as it may be, however, the perchlorates and the chlorates which contain the most oxygen, while having bleaching properties nevertheless are not bleaching agents in the practical art; they have never been used for bleaching cellulosic materials such as wood pulp. Hypochlorites, which contain the least oxygen, are the only chlorine salts which, prior to the discovery revealed in appellant's claims, had been found practicable for bleaching cellulose; and the prior art so taught.

The lower court also found that the British patent to Watt discloses a process of treating hemp, flax and other fibrous substances in which the substance is treated with chlorite, "and after repeating the treatment two, three or more times, the bleaching is completed with hypochlorous acid or other suitable bleaching agent." In this reference, also, the inventor described three *successive* steps: First, a treatment in caustic alkali; second, treatment in a solution of chlorite or hypochlorite; and as to the third, he said in his provisional specifi-

cation: "The fibrous substance *is now ready for bleaching.* This may be effected by exposing it to the action of hypochlorous acid, chlorous acid, or chlorine; but I greatly prefer the first-named acid." [Italics supplied] In a later specification, after describing the first two steps—the second a treatment in chlorite or hypochlorite—he said: "I then complete the bleaching by the action of hypochlorous acid or other suitable bleaching agent." In detailing the procedure of the third step he said: "When this point is arrived at, the fibre is again washed, and in place of being immersed in the solution of hypochlorite, which has been employed up to this point, it is immersed in a much weaker solution of the same salt, (say, of 1.033 specific gravity, to which is then added hydrochloric acid to liberate the hypochlorous acid, by which the bleaching is completed."

A close analysis of the Watt patent, therefore, reveals no disclosure of appellant's claim. In the third or bleaching stage of the Watt process, (1) chlorites were not specified; (2) the use of acid with hypochlorite was specified—a process which, although effective for bleaching, is so destructive of cellulose as to be impractical for industrial use; and (3) no description or disclosure appears at any point in the reference, of the different result obtained by using an acid solution in combination with chlorites as distinguished from using such a solution with hypochlorites.

It is not even contended by the Commissioner that the Trostel patent describes a process for using chlorites in an acid solution. The lower court found that the patent disclosed that "as ordinarily practiced" bleaching of paper pulp is accomplished by treating the fibre with a bleaching agent, such as chlorine, chlorite, hypochlorite, et cetera. It seems apparent that Trostel's reference to chlorite was *ignorantly or inadvertently* made. It is entirely unsupported by the unanimous testimony of experts who have been familiar with the art for years. The accidental stumbling onto a fact, or the unintentional statement of a fact, might be considered sufficiently a part of the prior art to require its investigation.[1] But a statement so contradictory to fact, as this was demonstrated to be, is not a part of the prior art. It is certainly a matter susceptible of proof whether "as ordinarily practiced the bleaching of paper pulp is accomplished by treating the fibre with a bleaching agent, such as * * * chlorite * * *." And the proof established that it was *not* practiced, ordinarily or otherwise.[2] But, more important than the untruth of the Trostel statement, is the fact that taking it at its full face value, it discloses nothing concerning the use of chlorites in an acid solution or the non-deteriorating effect thereof upon cellulose in the bleaching process. The known effect of acidification on hypochlorites in bleaching cellulose did not suggest acidification of chlorites for bleaching cellulose but suggested just the opposite. According to the teaching of the prior art, under ordinary conditions of bleaching, it was to be expected that the acidification of chlorites would degrade the cellulose to the same or a greater extent than the acidification of hypochlorites.

The most that can be said of all the references, therefore, is that they disclose the bleaching quality of chlorites when applied to wood pulps and other cellulosic material. This is far from enough to prevent the Taylor and White discovery from constituting invention. It is one thing to know that chlorites have bleaching properties and another to harness those properties in a process which is useful to industry. The similarity in atomic oxygen content of chlorites and hypochlorites is highly deceptive when considered in connection with the fact, well known to the prior art, that oxygen, when released, becomes the bleaching agent. The quantity of oxygen in chlorates and perchlorates is also similar, and greater in content than in either chlorites or hypochlorites. Yet it is not suggested that use of chlorates or perchlorates is an obvious step, even though it is well known that their oxygen content, if released, will bleach cellulose, and even though it is also well known how such oxygen can be re-

[1] Cf. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 66, 43 S.Ct. 322, 329, 67 L.Ed. 523.

[2] See Carson v. American Smelting & Refining Co., 9 Cir., 4 F.2d 463, 468–469: "In Deering v. Winona Harvester Works, 155 U.S. 286, 300, 15 S.Ct. 118, 123, 39 L.Ed. 153, it was said: 'Oral testimony, unsupported by patents or exhibits, tending to show prior use of a device regularly patented, is, in the nature of the case, open to grave suspicion.' And the court affirmed the wisdom of the rule requiring such anticipation to be proven by evidence so cogent as to leave no reasonable doubt in the mind of the court that the transaction occurred substantially as stated."

leased. The difficulty and danger involved in using all of these salts, including hypochlorites, is that they may destroy cellulose as well as bleach. Hypochlorites, however, having the least oxygen content of all, were —so far as the prior art knew—least destructive of cellulose while bleaching. ·This explained their exclusive general use in industry.

To argue that the substitution of a chlorite in an acid solution was an obvious step simply because hypochlorites in an alkaline solution had been used in the practice of bleaching wood-pulp, amounts to substantially the same thing as arguing that hydrogen peroxide ($H_2O_2$) is an obvious substitute for drinking water ($H_2O$) or that carbon monoxide (CO), the deadly poison which is present in automobile exhaust gases, is an obvious substitute for dry ice, carbon dioxide ($CO_2$). It is not as if oxygen were a constant which might be carried around in a bucket constructed of hydrogen or carbon or chlorine and dumped into a vat of cellulose with the same effect in each case.[3] If the suggested substitution was obvious it would seem even more obvious to convert graphite into diamonds because their atomic contents are not merely similar but exactly the same.[4] But thus far no mechanic seems to have reduced that conversion into an industrial practicality. Slight atomic changes or rearrangements in the constituents of chemical combinations produce profound changes in their properties and reactions.[5] In the present case, although the molecular form or atomic content of the chlorites was well known long before 1930, the chemistry of acidified chlorites was not known; in fact the effect of acids on chlorites is only little known even now. And while hypochlorites have been used in the industry for many years and their reactions in bleaching are reasonably well known, the fundamental differences between the chemical reactions of chlorites and hypochlorites in acid solutions were not known prior to the Taylor and White discovery.

Under pressure of demands from the consumer market for an increasingly whiter and tougher product, even the use of hypochlorites became increasingly unsatisfactory because, in what had been theretofore regarded as commercially successful bleaching with alkaline hypochlorites there was a considerable degradation of cellulose. For years the scientists searched for a process which would produce the desired whiteness without destroying the cellulose. Prior to 1930 there was no known way to accomplish that objective, and the long existing and well recognized need was not satisfied until White and Taylor discovered that degradation of cellulose does not occur in bleaching with chlorites in an acid solution.[6] Witness

---

[3] " * * * The chemist pictures the properties of every substance as being determined by the chemical makeup of its molecules, i. e., by the nature of the atoms which are contained in each molecule of the given substance, and the manner of their arrangement. * * * the molecules of grape sugar (glucose) and fruit sugar (fructose) contain identical atoms in identical proportions but the properties of these substances are nevertheless different because the atoms are differently arranged in the two kinds of molecules.

"The complete change of properties which is associated with chemical action is therefore to be considered as being accomplished by the recombination or rearrangement of atoms to produce new sorts of molecules." 5 Encyc. Brit. (14th ed.) 341.

[4] 7 Encyc. Brit. (14th ed.) 316.

[5] Ex parte Morris S. Kharasch, 19 U.S. P.Q. 185, 186: "It is now the well established practice in chemical cases not to assume that untried chemicals will have the same effect as others unless there is such a structural similarity as to suggest to those skilled in the art that the result would be substantially the same.

We have had no satisfactory reason presented to us for causing us to conclude, merely because certain salts of mercury are effective as disinfectants, that all salts of this metal would also be of this nature. Particularly in view of appellant's contention that the compounds covered by the appealed claims are substantially more effective than those of the principal reference, we do not consider that the Office is justified in holding appellant's contribution unpatentable without other evidence than that before us." See, also, Kuehmsted v. Farbenfabriken of Elberfeld Co., 7 Cir., 179 F. 701, certiorari denied, 220 U.S. 622, 31 S.Ct. 724, 55 L.Ed. 613.

[6] Dr. Bjarne Johnsen testified: "The bleaching agent commonly used on the pulp has been hypochlorite. Hypochlorite has its selective action in that it reacts first with the impurities; but very soon during the reaction it also attacks the cellulose fiber; and especially at this time when the requirements for whiteness are very much more exacting than they were some years ago, it is impossible by the hypochlorite method of bleaching to do that without serious attack on the fibers. With the hypochlorites it is now

Vincent, testifying concerning the discovery of the value of chlorites for bleaching, said:

"The chlorites when acidified and used as bleaching materials have a very unexpected property of bleaching the colored material without affecting the cellulose. And they are as different as day from night —from the hypochlorites in this use. . . .

"So that the chlorites under acid conditions are something that the cellulose industry has been looking for for a long, long time; that is, a thing that will bleach rapidly and that does not have any effect on the cellulose. It is an unexpected thing and it is a thing of great importance to the whole cellulose industry in all of the compounds that it makes; and it is very, very different from the actual [action of the] hypochlorites."

Moreover, the use of the new acid chlorite process, as disclosed by Taylor and White, is much more economical. It saves man power by avoiding the necessity for careful regulation of laboratory conditions and machinery, which was essential when the hypochlorite process was used. When the latter method was used it was not an unusual occurrence for the pulp to be destroyed by overexposure to the bleaching agent. This destruction is avoided by the use of the new process.

In our view, therefore, the discovery made by the applicants in this case constituted invention. Their process was not taught by the prior art; in fact it contradicted the teachings of the prior art,[7] and in so doing produced a new and useful result.[8] It met a long standing need of the industry[9]—a practical method of bleaching cellulosic material without deteriorating the material itself; and it constituted a marked advance in the art.[10]

Reversed and remanded.

---

impossible under ordinary commercial conditions to obtain the required whiteness without destruction or degradation of the cellulose present. It has been recognized for some time that hypochlorites have this capacity for both bleaching and attacking the cellulose. In my own experience I have known that fact as long as I can remember. I remember that in 1913 I developed a test to indicate the point where the cellulose was being attacked, in order to be able to stop the reaction at that time.

"Constant efforts have been made to develop processes or bleaching materials that would not attack the cellulose while bleaching. First of all, it has been attempted to bleach at a lower temperature, by doing that at a higher density. That means that the action, because of the higher concentration of the pulp, would be more rapid. Then also it has been attempted, by dividing the bleaching operation into several stages and washing out or dissolving impurities between the stages, to lower this injurious effect.

"Prior to 1930 there was no bleaching agent available for commercial use in the wood-pulp industry that would bleach to a required color and not attack the cellulose.

"I have stated that I was familiar with the use of chlorites for bleaching purposes in connection with the pulp. I have used those materials in acid solution. I will explain the action of the bleach, which includes the chlorite in an acid condition—referring always to wood pulp. Exactly what the action is, I cannot say. I mean, as far as the exact

chemistry of the action, we have only been able to tell by the results. But by using acid chlorites at certain temperature, we have been able to bleach our pulps up to the same high whiteness as we get with hypochlorite, without any injury to the fiber."

[7] See Davies v. Coe, 65 App.D.C. 345, 346, 83 F.2d 602, 603: "Appellant's method differs radically from Bligh. In fact, in the light of appellant's successful disclosure, it may be said that Bligh has taught the art what not to do instead of what to do." See, also, Naylor v. Alsop Process Co., 8 Cir., 168 F. 911, 918; Celluloid Mfg. Co. v. American Zylonite Co., C.C., S.D.N.Y., 35 F. 301.

[8] See Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177; In re Eastwood, 33 App.D.C. 291, 300; In re Coffield, 50 App.D.C. 259, 261, 270 F. 695, 697; Dow Chemical Co. v. Williams Bros. Well Treating Corp., 10 Cir., 81 F. 2d 495, 497, certiorari denied, 298 U.S. 690, 56 S.Ct. 960, 80 L.Ed. 1408; Independent Oil Well Cementing Co. v. Halliburton, 10 Cir., 54 F.2d 900, certiorari denied, 286 U.S. 544, 52 S.Ct. 496, 76 L.Ed. 1281; N. O. Nelson Mfg. Co. v. F. E. Myers & Bro. Co., 6 Cir., 25 F.2d 659; 1 Walker, Patents (Deller's ed. 1937) 147–149.

[9] See In re Moore, 38 App.D.C. 276; Kelley v. Coe, App.D.C., 99 F.2d 435.

[10] See Minerals Separation, Ltd. v. Hyde, 242 U.S. 261, 270, 37 S.Ct. 82, 61 L.Ed. 286; General Electric Co. v. Hoskins Mfg. Co., 7 Cir., 224 F. 464, 471; In re Glafcke, 51 App.D.C. 204, 277 F. 603; In re Eastwood, supra note 8.