**FOREMOST DAIRIES, Inc., Plaintiff,**

v.

**Robert C. WATSON, Commissioner of Patents, Defendant.**

**Civ. A. No. 1613–53.**

United States District Court
District of Columbia.

July 27, 1955.

C. Willard Hayes, Washington, D. C., James P. Hume, Chicago, Ill., for plaintiff.

E. L. Reynolds, Sol., U. S. Patent Office, Washington, D. C., for defendant.

MORRIS, District Judge.

This is a proceeding in which the plaintiff seeks, pursuant to Title 35, Section 145, U.S.C. (formerly Section 4915, Revised Statutes), a determination that it is entitled to receive a patent on a milk powder product described in claim 33 of application, Serial Number 697,954, filed on or about September 19, 1946, and authorization to the Commissioner of Patents to issue such patent. Said application was filed by Paul F. Sharp and subsequently assigned by him to Golden State Company, Limited, of which corporation the plaintiff is successor. Said application also contained claims for a process for the production of the product here involved. The process claims have been allowed, and there only remains for consideration claim 33, which reads as follows:

"An essentially dry milk powder, made up of particles which are substantially spherical in shape, and which has substantially all of its protein content in a form capable of producing a stable suspension in water, and also having therein a substantial portion of its lactose content in the form of identifiable alpha lactose crystals."

The references cited in the Patent Office, upon which rejection of this claim was based, are the following:

"Chuck .......... Patent No. 2,016,592
"Peebles ........ Patent No. 2,088,606
"Hunziker 'Condensed Milk and Milk Powder,'
  6th Edition, March 1946, Pages 23, 26, 409, 435 and 436.
"Visser .......... Patent No. 2,044,194
"Hall .......... Patent No. 2,188,506"

At the hearing Dr. Paul F. Sharp and Dr. Clayton A. Kempf testified at length on behalf of plaintiff as to facts relating to the claimed invention and the prior art. No witnesses were called or testified on behalf of the defendant. The characteristics of the claimed invention as shown by the evidence and revealed by the specifications are as follows:

"1. The milk powder is made up of particles which are substantially spherical in shape (that is to say, they are of that conformation which results when milk is subjected to a spray drying process);

"2. the milk powder has substantially all of its protein content in a form capable of being reconstituted, or, in other words, of producing a stable suspension in water; and

"3. the dry milk powder has a substantial portion of its lactose content in the form of identifiable alpha lactose crystals, whereby it is a non-hygroscopic and non-caking powder."

Without going into detail as to the voluminous evidence, it is clear that, prior to the present claimed invention, the methods of producing milk powder was either by the spray drying method or by the drum drying method, and, while the properties of the spray dried milk are superior to the properties of drum dried milk in that the dispersibility of the solid proteins is maintained to a higher degree in spray dried products than in drum dried products, the procedures, as practiced in the past, inevitably and necessarily converted the lactose constituent of the milk into the so-called glass or amorphous form as distinguished from the alpha crystalline form. It was also made clear that milk powder containing the lactose constituent of the milk in amorphous or glass form is hygroscopic, or, in other words, possesses the properties of taking up water and in addition of forming into a hard cake as a result of such moisture absorption and in the caked and moistened condition of undergoing chemical change which renders the protein content of the milk incapable of being reconstituted or permanently suspended in water in a manner productive of a liquid food resembling natural milk. It was further established that this tendency of milk products of the prior art to cake had prevented a widespread use thereof in the household as a form of milk for household consumption, and had in fact restricted the use of milk powder in large measure to commercial use such as that of making bakery products, ice cream and other industrially produced foods. It was further established that milk powder containing its lactose in the amorphous or non-crystalline form, or, in other words, a milk powder which is subject to caking, and consequently spoilage, could be rendered non-caking by permitting the same to stand in the presence of sufficient moisture for a substantial period of time, or, in other words, a period of time which would enable the lactose in the milk to change from the glass or amorphous form to the crystalline form; but, as a consequence of such change in the form of the lactose, the protein embodied in the milk would also undergo change during the crystallization period, with the result that the protein became denatured and would be rendered incapable of being suspended or reconstituted to form a liquid similar to natural fresh milk. It was in this state of the prior art, according to the abundant evidence in this case, that Dr. Sharp entered the field and invented a product which is non-caking, and which, therefore, possesses its constituent lactose in alpha crystalline form, and which at the same time has its protein content unchanged and, therefore, is capable of forming a permanent suspension in water similar to that of natural fresh milk.

Dr. Sharp invented a process by which the product could be made, and this process involved the steps of seeding the concentrated milk prior to subjecting it to the spray drying treatment in conventional spray drying apparatus. The purpose was to provide an unusually large number of seed crystals in the concentrated milk prior to the spray drying, with the number of such crystals so collected or determined as to provide in the concentrated milk a number sufficient to allow substantially at least one seed crystal to each droplet or particle formed by the sprayer in the spray drying machine. It was fully brought out in the testimony that, when the initial drying action takes place, the drying of the sprayed particles is effected under conditions wherein at least one seed crystal is present in each of the particles or droplets, respectively. The crystallizing effect of the included seed in each droplet results during the period of flight of the droplets in the drier, in a conversion of the lactose coming out of solution in alpha crystalline lactose, with the result that the finished product contains high quantities of alpha lactose crystals instead of the lactose in the glass or amorphous form. The protein constituents of the milk are protected in the spray drying process so that they are not denatured or rendered incapable of being

reconstituted or redispersed in water. Thus the product described in the claim here involved, not having the glass or amorphous form of lactose, does not have the tendency to cake, and is, as stated, readily reconstituted or redispersed in water.

Of the cited references relied upon in the Patent Office, the principal ones were Chuck, Peebles, and the Hunziker publication. It was shown by the evidence in this case that the Hunziker article was not published prior to the date of the invention here claimed and, therefore, is not a proper reference to be cited against the claimed invention. The Peebles patent does not even contend that he preserved the solubility of the protein, and, therefore, the only reference to be considered is the Chuck patent.

It is not the invention of Chuck that is urged as a bar to the patentability of the claim here involved, but the reference in the Chuck patent to what he considered to be the prior art, principally in the following language (line 24, column 1, of the Chuck patent):

> "The proteins when dried in this manner exist in aggregates of particles of colloidal dimension; the fats in practically the same state of division as in the liquid milk; the mineral salts in the crystalline state and the lactose, partly crystalline and partly amorphous."

It is the contention of the defendant that Chuck thus described the product which is the subject matter of the claim here involved. Aside from the emphatic and the abundant evidence at the hearing that there was not known to the prior art at the time Chuck entered the field such a product as that which he described as being known to the prior art, Chuck's own subsequent statements in the patent show that the product referred to by him did not have the non-caking and dispersible qualities claimed in the present invention.

Much of the hearing and of the briefs is concerned with the proposition as to whether an erroneous statement of the prior art is a disclosure which will prevent a patent of a subsequently discovered product. I think the decision in the case of Mathieson Alkali Works v. Coe, 69 App.D.C. 210, 99 F.2d 443, decided December 26, 1938, is controlling. There it was held that a statement so contradictory to fact, as this was demonstrated to be, is not a part of the prior art. Here it has been amply established that the product erroneously referred to by Chuck was not a part of the prior art. In this view, I conclude that the plaintiff is entitled to the relief prayed for, and judgment will be entered accordingly.

Counsel will prepare and submit appropriate findings and order to carry this decision into effect.