## NATIONAL LEAD CO. v. MARZALL.
### No. 10873.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 9, 1951.

Decided May 29, 1952.

Clark, J., dissented.

Mr. John H. Bruninga, St. Louis, Mo., with whom Mr. Richard G. Radue, Wash-

ington, D. C., was on the brief, for appellant.

Mr. H. S. Miller, U. S. Patent Office, with whom Mr. E. L. Reynolds, Sol., U. S. Patent Office, was on the brief, for appellee.

Before CLARK, PROCTOR and FAHY, Circuit Judges.

FAHY, Circuit Judge.

This appeal seeks reversal of the action of the District Court, in proceedings under Rev.Stat. § 4915, as amended, 35 U.S.C. § 63 (1946), 35 U.S.C.A. § 63, holding that appellant, owner by assignment of a patent application, was not entitled to letters patent on certain claims therein set forth. The court found that the claims did not define an invention over the disclosures of the prior patent of Cannon (No. 2,109,858) and the prior publication of Stern (pp. 76 and 77 of the Report of Investigations No. 3556 of the Bureau of Mines). Other findings were made but in our view those referred to are dispositive of the case.

The claims relate to a process used in the drilling of wells by the rotary system, particularly oil and gas wells. In such drilling there is employed a watery, mud-laden fluid, called a drilling mud. The importance of this fluid is indicated when the drilling process itself is described. The rotary system involves the use of a drill pipe with a bit at the bottom. This bit is larger than the pipe in order to make the hole larger. At the top is a drill stem of squared section sliding through a rotary table. The whole of this section is suspended so that it can be let down into the bore hole. A drilling fluid, which is pumped down the drill pipe, issues at the bottom through holes in the bit. As the hole is cut, the drilling fluid, rising outside the drill pipe, carries the cuttings to the top where the fluid flows along a mud ditch and over a vibrating screen through which the cuttings are in large part deposited. The fluid then passes to a suction pit where it is picked up by pumps for recirculation. The viscosity of the drilling fluid is critical, because if the fluid is too thin the cuttings will not be carried out of the hole, and if too thick, the fluid cannot be pumped out and will not deposit its cuttings. The fluid changes in composition because of the presence of cuttings and also because ground water will seep into it from the exposed surface of the bore hole. This requires the drilling mud engineer to add water or weighting material or chemicals, more or less continuously.

One of the important functions of a drilling fluid is to seal up the wall of the bore hole. This it does by a filtering action in which the water from the fluid passes into the formation being drilled, leaving clay behind. Unless the wall is sealed the pressure in the formation might blow the drilling fluid out of the hole and, also, there might be too great a flow of water from the fluid into the producing horizon. Unless this is kept to a minimum the oil and gas will be forced back so that they cannot be produced or will be produced only at a reduced rate. The passage of water from the drilling fluid is called "water loss" and is measured in cubic centimeters.

Viscosity of the fluid must be maintained at a consistency which will enable it to convey the cuttings and also seal the bore hole. This is accomplished by treating the fluid with gelatinized or hydrolyzed starch. Mud so treated, however, ferments unless it contains a substantial quantity of salt. The problem has been to obtain a drilling fluid having the qualities needed to accomplish the desired purposes above indicated in an efficient manner for general use, not merely in formations containing salt, and without fermentation.

The basis of appellant's claim is that its assignors discovered that these results could be accomplished, without fermentation, by bringing the drilling fluid to a high degree of alkalinity[1] and maintaining it there. As more fully stated in appellant's brief:

"The characteristic feature of the invention resides in maintaining the alkalinity of the drilling fluid at a definite value, so as to not only attain, but to maintain the wall seal at a 'low water loss', during the course of drill-

1. The symbol for alkalinity is pH.

ing, but with all at an operable viscosity or consistency. The specification and the claims, as will be later shown, express the alkalinity as well as the water loss in well known scientific terms, the former as 'at a pH of about 12' and the latter as 'below 5 cc'."

To the fluid thus referred to there is added a "starchy colloid," *i. e.,* gelatinized starch, to seal the wall of the bore hole in the manner already described. With the fluid at a pH of about 12 (the range given is between 11.7 and 13.3) starch can be added in amounts to hold the water loss to below 5 c.c., while the fluid is held to an operative drilling viscosity, without deterioration of the starchy colloid by fermentation. Unless the fluid is maintained with a pH of about 12 the continuous introduction of clay salts and water would change the degree of its alkalinity essential to the desired result.

The Cannon patent relates to a drilling fluid (for shale) which includes a starch and caustic soda. A 1% solution of the latter will hydrolyze or gelatinize the starch. On adequate evidence the court found that the pH value of a 1% solution of caustic soda is just under 13.0. Insofar as the publication of Stern is concerned it was found, also with adequate evidentiary support, that he had explained the use of hydrolyzed starch in a well drilling fluid and said that a pH of about 11.0 or 12.0 had been found desirable. The following is taken from his publication:

"It is only recently that starch has found application in drilling muds as a result of the development that hydrolyzed starch imparts a good filter test to salt-water mud. For this purpose the starch may be hydrolyzed by boiling a 10-percent starch suspension in sodium hydroxide (1 percent by weight; or starch: sodium hydroxide 10:1). A pH of about 11 or 12 has been found desirable."

In the aggregate of these prior disclosures of Cannon and Stern, what can be pointed to as missing which appellant supplied? It is clear a well drilling fluid which contained starch and caustic soda was known, and that when the solution contained 1% of caustic soda the starch would gelatinize or hydrolyze; and although it was not so stated by the Cannon patent, it is a fact that the pH value of a 1% solution of caustic soda is just under 13.0. Appellant urges that the reference by Stern to the desirability of maintaining a pH of about 11.0 or 12.0 was to the alkalinity not of the drilling fluid itself but of a preparation to be added to it. From this it is argued that the alkalinity would be diluted once the preparation were added to the fluid, and accordingly the fluid itself would not, as disclosed by Stern, have the required alkalinity. The District Court found, however, that Stern referred to the desirability of maintaining a pH of about 11.0 or 12.0 in the drilling mud or fluid itself. From the language used by Stern this was a reasonable interpretation, especially since it accords with the actual result desired by use of the fluid. But even if we should construe this reference of Stern to apply to the preparation, our conclusion would be the same, because, even putting aside the disclosures of Cannon, the experimental step between the needed composition of the preparation and that of the mud itself would be too short an advance beyond the prior art as disclosed by Stern to constitute patentable invention.

Finally, appellant contends it was unknown that gelatinized starch could be prevented from deteriorating in a drilling fluid by maintaining the alkalinity of the latter at about 12.0. Assuming this to be true, patentability would not result from ascertaining that fact. Such a fluid for well drilling purposes was a least indicated by prior disclosures. Increase in knowledge of its properties did not call for the grant of a patent, Roberts v. Ryer, 1875, 91 U.S. 150, 23 L.Ed. 267, nor did the step between any uncertainty residing in the prior disclosures and the certainty arrived at by the appellant's assignors. Under the principles governing our review of the findings of the District Court in such a case, recently analyzed in Standard Oil Development Co. v. Marzall, 1950, 86 U.S.App.D.C. 210, 181 F.2d 280, we refrain from disturbing the

judgment of that court. See, also, Larsen v. Marzall, 1952, 90 U.S.App.D.C. 260, 195 F.2d 200.

Affirmed.

CLARK, Circuit Judge, dissents.