**E. I. DuPONT de NEMOURS AND COMPANY, Appellant,**
**v.**
**David L. LADD, Commissioner of Patents, and Luther H. Hodges, Secretary of Commerce, Appellees.**

**No. 17883.**

United States Court of Appeals
District of Columbia Circuit.
Argued Dec. 6, 1963.
Decided Jan. 30, 1964.

---

Before EDGERTON, Senior Circuit Judge, and WILBUR K. MILLER and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge:

In September 1952, two employees of appellant, E. I. Du Pont de Nemours and Company, filed with the United States Patent Office a patent application entitled "Polymerizable Nitrile and Polymeric Product Obtained Therefrom."[1] Subsequently, Du Pont, applicants' assignee, duly prosecuted the application in accordance with the requirements of law and the rules of the Patent Office. On September 27, 1957, the Primary Examiner of the Patent Office entered a Final Rejection of all claims included in the application. Du Pont thereupon appealed the final rejection of claim 1 and, in amended form, claims 3 and 4, to the Board of Appeals of the Patent Office, which, on October 17, 1960, rendered a decision affirming the Primary Examiner's rejection of claims 1, 3 and 4. The Board subsequently denied Du Pont's petition for reconsideration.

Appellant then filed its complaint against the Commissioner of Patents and the Secretary of Commerce, appellees here, in the United States District Court for the District of Columbia pursuant to 35 U.S.C. § 145,[2] seeking a decree authorizing the Commissioner of Patents to issue Letters Patent on the rejected claims of the patent application. A trial on the merits was had and, on March 20, 1963, the District Court entered an order dismissing the complaint, finding that appellant was not entitled to a patent containing claims 1 and 3.[3] This appeal followed.

Essentially, two issues are presented: (1) whether the compound represented by claims 1 and 3 is unpatentable under 35 U.S.C. § 102;[4] and (2) whether claim

Mr. W. Philip Churchill, New York City, with whom Messrs. C. Harold Herr and Frederick Schafer, Washington, D. C., were on the brief, for appellant.

Mr. J. Schimmel, Atty. United States Patent Office, with whom Mr. Clarence W. Moore, Solicitor, United States Patent Office, was on the brief, for appellees.

1. Serial No. 311,544, subsequently Serial No. 382,842 as a continuation-in-part application.

2. 66 Stat. 803 (1952), 35 U.S.C. § 145 (1958).

3. Claim 4 was likewise dismissed, appellant having abandoned that claim at the trial.

4. 66 Stat. 797 (1952), 35 U.S.C. § 102 (1958): *"Conditions for patentability; novelty and loss of right to patent* A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or de-

1 is further unpatentable for failure to meet the standards of particularity and distinctness required by 35 U.S.C. § 112.[5]

I

The claims involved here read as follows:

"1. Tetracyanoethylene.

"3. White crystalline monomeric tetracyanoethylene characterized (1) by melting within the range of 195–200°C. in a sealed tube, (2) by being sublimable in air at 120–150°C., (3) by having an infrared absorption spectrum with a divided band characteristic of conjugated unsaturated nitriles, and (4) by formation with toluene of an orange-colored 1:1 complex having a light absorption maximum at 4060A when dissolved therein."

Tetracyanoethylene is described as an organic chemical compound having extraordinary properties. As indicated by the application, the substance reacts with certain other chemicals to produce strong permanent dyes for synthetic fibers, and its polymers and co-polymers are highly useful as insecticides, as well as motor coil and transformer wire insulation where high temperatures are encountered. The compound itself has the following structural formula:

$$NC\diagdown \quad \diagup CN \atop NC\diagup C=C \diagdown CN$$

The tribunals of the Patent Office rejected both claims 1 and 3 on the ground that they had been anticipated, and hence precluded from patentability, by a prior patent (No. 2,264,354) issued to *Alder et al.* in 1941 entitled "Addition Products of Dienes and Unsaturated Esters, Ketones, or Nitriles." Included in that patent was the following formula:

"wherein $R_1$ and $R_2$ stand for a member of the group consisting of CN, acyl and an esterified carboxylic acid group,

$R_3$ stands for a member of the group consisting of hydrogen, CN, acyl and an esterified carboxylic acid group and

$R_4$ stands for a member of the group consisting of alkyl, oxalkyl, aryl, CN, acyl and an esterified carboxylic acid group."

A second reference in the Alder patent found to be significant by the District Court, and indicated on appeal, is the following sentence:

"Examples for the other reaction components falling within the above definition are the products of the condensation of aldehydes and acetyl acetic acid esters or malonic acid esters, furthermore, ethylenetetracarboxylic acid esters, the corres-

---

scribed in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *".

5. 66 Stat. 798 (1952), 35 U.S.C. § 112 (1958): *"Specification*

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or

with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

ponding nitriles, and furthermore, the products of the condensation of aldehydes and 1.3-diketones such as acetylacetone."

The Patent Office argued, and the District Court agreed, that the disclosures made by the earlier Alder patent "would clearly teach a person of ordinary skill in the art that certain chemical structures would be obtained by making directed substitutions in a general formula specifically disclosed," and that, consequently, the disclosures of the Alder patent were "sufficient under the law to bar a later applicant from obtaining a claim to said chemical structure." Accordingly, on the basis of Application of Baranauckas, 228 F.2d 413, 43 CCPA (Patents) 727 (1955), the District Court held that appellant was not entitled to a patent on claim 1. Further, while noting that the "pure compound" of claim 3 was *not* suggested by the Alder patent, the court reasoned that its unique properties could be ascertained only after having successfully produced the compound of claim 1. Thus, claim 1 having been determined to be implicit in the Alder patent, claim 3 was considered merely "an increase in knowledge of a prior disclosure," and therefore unpatentable under National Lead Co. v. Marzall, 91 U.S.App.D.C. 63, 198 F.2d 296 (1952).

*Claim 1.*

In Shell Development Co. v. Watson, 102 U.S.App.D.C. 297, 252 F.2d 861 (1958), this court adopted the District Court holding that, in order to defeat a patent application on the basis of 35 U.S.C. § 102(a),[6] a prior publication must "exhibit the thing claimed in such an intelligible manner as to enable persons skilled in the art to which the invention is related, to comprehend it." Moreover, in Application of LeGrice, 301 F.2d 929, 939, 49 CCPA (Patents) 1124, 1138 (1962), it was said:

"[T]he proper test of a description in a publication as a bar to a patent as the clause is used in section 102 (b) requires a determination of whether one skilled in the art to which the invention pertains could take the description of the invention in the printed publication and combine it with his own knowledge of the particular art and from this combination be put in possession of the invention on which a patent is sought. Unless this condition prevails, the description in the printed publication is inadequate as a statutory bar to patentability under section 102(b)."

In the case before us, three of the four expert witnesses who testified regarding the anticipation of claims 1 and 3 by the earlier Alder patent [Theodore L. Cairns, Louis F. Fieser and Arthur C. Cope] stated that the general $R_1$, $R_2$, $R_3$, $R_4$ formula gives rise to an infinite number of possible compounds inasmuch as the acyl, alkyl, aryl, oxalkyl and esterified carboxylic acid groups mentioned in the formula represent *classes* or *groups* of substituents, within each of which are an infinite (or at least an indefinite) number of specific elements. Hence, even if one were to pick and hold constant a substituent for $R_1$, $R_2$ and $R_3$ in the general formula, an infinite number of specific compounds would be suggested each time one of the above-named substituents was substituted for $R_4$. The unequivocal testimony of these three witnesses was that, as a consequence of the vast scope of the general formula, this disclosure in the Alder patent would not suggest tetracyanoethylene to one skilled in the art of organic chemistry. As graphically stated by Dr. Cope:

"Taking all of the possible combinations and permutations of $R_1$ and $R_2$ and $R_3$ and $R_4$, and recognizing how many of them may be of infinite scope, that formula is just about as broad as the universe; and, in my opinion, it is so broad that it would lead no chemist to the selection of any specific compound falling within that area. * * * I would

6. Note 4, *supra.*

say that this is so broad that for a chemist to be led to any specific compound by this formula would be just about the same as being led to a specific Chinese baby being born at this moment."

The District Court, however, based its decision on the cross-examination testimony of Donald J. Cram, the ·fourth of appellant's experts to testify regarding the scope of the Alder patent. The court stated:

"It appears in the record that Dr. Cram, an expert testifying on behalf of plaintiff stated that if the directions shown by the reference for making the substitutions in the general formula are made 'you would encounter tetracyanoethylene as the eighth compound,' and, accordingly, it would appear that the holding of the *Baranaukas* [*Baranauckas*] case, *supra,* is clearly pertinent and would tained by making directed substitutions, which is exactly equivalent to teach a person of ordinary skill in the art that a structure would be obone in which compounds are actually illustrated."

The court was therefore of the view that since the formula for tetracyanoethylene could be arrived at by a mechanical application of the named substituents in the Alder formula, the earlier patent was an anticipation under 35 U.S.C. § 102, and the present application was properly rejected.

We are of the opinion that a close reading of the entire deposition of Dr. Cram clearly indicates a contrary conclusion. On direct examination, Dr. Cram was shown the Alder patent and asked whether, as a chemist, he would find in the general formula and language of that patent "any description of tet-

racyanoethylene that is meaningful to you as a chemist?" His answer was:

"If I had never heard the term 'tetracyanoethylene' or seen its formula written down and I read this patent I would not consider that I had heard of tetracyanoethylene."

He further testified:

"I don't see anything here that would lead me to the structure of tetracyanoethylene in reading of this.

\*        \*        \*        \*        \*

"I can't conceive of predicting the properties of tetracyanoethylene as I know them today from anything· that is written down in this patent."

Under cross-examination by counsel for the Patent Office, Dr. Cram testified that although the cyano (CN) group was the first one mentioned for $R_1$ and $R_2$, it did not stand out from the other groups also mentioned by Alder for $R_1$ and $R_2$. His testimony continued:

"Q. Isn't it reasonable to assume that one skilled in the art would select the first one mentioned?

"A. Not necessarily. I think he might well pick the one with which he had had the most experience."

Dr. Cram was then directed by the cross-examiner to *assume first that $R_1$ and $R_2$ of the general formula were both CN groups,* and then to make the substitutions for $R_3$ and $R_4$ in the order mentioned in the patent.[7] It was only in answer to this restrictive question, relating more to statistical probabilities than to a chemist's usage of the Alder formula, that Dr. Cram testified:

"Then I believe that you would encounter tetracyanoethylene as the eighth compound."

---

7. Significant is the testimony of Dr. Fieser concerning the substitution of more than two cyano groups in the general Alder formula: "\* \* \* I feel that as a chemist I couldn't interpret this general formula with a cyano-hydrocarbon beyond those containing 1 and 2 cyano groups, because there are no other examples but those included in the patent, and in Alder's original paper no mention is made of anything having more than two cyano groups and I think I would have to stop at that point."

Dr. Cram's testimony on re-direct examination is explanatory of that statement. When asked how many different organic chemical compounds would be covered if he started with CN groups substituted for $R_1$, $R_2$ and $R_3$, and then went through all the possible variations for $R_4$, he stated:

"You could conceive of arriving at this tetracyano compound after listing an infinite number of—almost an infinite number of other compounds, but *you would arrive at the tetracyano compound eighth if you are willing to use family structures of compounds and not particular compounds;* and that is a thought that *my questioner on cross-examination was referring to classes of organic compounds when I arrived at that number eight or eighth, and not to particular compounds.*" [Emphasis added.]

It seems clear, therefore, that Dr. Cram's testimony, viewed in its entirety, indicates his complete accord with the other three expert witnesses regarding the infinite breadth of the Alder formula and the resultant improbability of a skilled chemist being led by that formula to tetracyanoethylene as a specific compound.

A second reference in the Alder patent, "ethylene-tetra-carboxylic acid esters, the corresponding nitriles," was also urged as a disclosure sufficient to preclude patentability inasmuch as one of the corresponding nitriles of ethylene-tetra-carboxylic acid esters would be tetracyanoethylene. On this point all the expert testimony was uniform that the entire sentence (set forth *supra* in full) was ambiguous, and that the words "corresponding nitriles" referred not only to ethylene-tetra-carboxylic acid esters, but to *all* the prior references in the sentence. In the words of Dr. Cope:

"I have read this sentence many times, and I find it completely ambiguous. I do not know what is meant by 'corresponding nitriles.' * * * I don't know what a nitrile is corresponding to in any of these classes. That is not a chemically precise definition, and my conclusion would be that, whatever it means, it is of the same infinite scope essentially as the $R_1$, $R_2$, $R_3$, $R_4$ formula."

Based on this ambiguity, and the fact that this reference, like the general formula, allows of innumerable possibilities, the expert testimony indicated clearly that tetracyanoethylene would not be suggested to one skilled in the art.

Additional testimony established that a scientific article published in 1939 by Alder and Rickert, covering essentially the same subject-matter as the 1941 patent and using many of the same examples, did not include tetracyanoethylene directly, indirectly, by implication or otherwise. Moreover, in 1942 an abstract of the Alder patent, prepared by a trained chemist, appeared in Chemical Abstracts (a publication of the American Chemical Society) summarizing for chemists what the Alder patent described. It is significant that, according to Dr. Cairns's testimony, this abstract not only did not mention tetracyanoethylene, but described the ethylene family of compounds used in the Alder process in language which would not even include tetracyanoethylene within its scope.

It seems clear to us, therefore, from a reading of the entire record, that the disclosures in the Alder patent would not have taught one skilled in the art the subject-matter of claim 1. It follows that claim 1 is not rendered unpatentable by 35 U.S.C. § 102.

The cases of Shell Development Co. v. Watson, supra, and Application of Baranauckas, supra, are cited by appellee as authority compelling a contrary result. We disagree.

In *Shell Development*, the prior publication, unlike the Alder patent, gave in detail the specific formula of the specific compound in question and was part of the standard chemical literature understood to describe *already known* compounds. Also, there was testimony in that case that one skilled in the art could

easily have arrived at the claimed compound from a reading of the earlier publication.

In *Baranauckas*, the prior publication relied upon was one of the standard authoritative German publications of chemical literature. This publication described a bromine compound which exactly corresponded to the chlorine compound claimed by the applicant except for the difference between bromine and chlorine atoms. In addition, the publication described how to make these compounds and stated that chlorine and bromine behaved identically in the process of making the compound. The court reasoned there that it was a simple procedure to substitute chlorine for bromine in the process set out in the prior publication, and hence "would clearly teach a person of ordinary skill in the art" the claimed compounds.

Contrasting with the two cases cited by appellees, the testimony in the case before us is clear and specific that one skilled in the art would not be led to tetracyanoethylene by the Alder patent. Hence those cases are inapposite to the facts here.

It should be noted also that the court in *Baranauckas* stated:

" * * * though our decision is compelled by the existing law, we feel constrained to point out that there are limits to the doctrine of those cases. What the precise boundary lines are, we are unable now to discern. Certainly they do not extend so far as to permit publication of theoretical lists of hundreds or thousands of possible compounds to deny patent protection on such compounds to those who actually discovered them later. * * * " 228 F.2d at 416, 43 CCPA (Patents) at 731.

Even if there were some doubt that the Alder patent was not an implicit disclosure of tetracyanoethylene, within the meaning of the *Baranauckas* holding, the policy considerations suggested by that court would compel the same result. Certainly the Alder patent, allowing as it did an infinite number of possibilities, would be minimally described as an implicit "publication of theoretical lists of hundreds or thousands of possible compounds," and thus would not be an appropriate anticipation of a later patent application for a specific compound.

Finally, the following language of the District Court in Phillips Petroleum Co. v. Ladd, 219 F.Supp. 366, 369 (D.D.C. 1963) is singularly applicable:

"When, by reason of a combination of properties and characteristics, a new product constitutes a substantial improvement, providing unforeseen uses and results, the product represents a difference in kind and not merely in result. [Citing cases.] As distinguished from difference in degree, difference in kind exists when a product possesses a unique combination of extraordinary and novel properties and characteristics of which the prior art was not aware." [Citing cases.]

In the present case, the expert testimony established tetracyanoethylene as an organic chemical compound having extraordinary properties. The substance exhibits an unusual stability to oxidation but, when it does burn, produces an extremely hot flame. It reacts uniquely with certain aromatic solvents to produce various color complexes. The compound enters into substitution reactions with nucleophiles, evidences an unusually stable radical anion, and is possessed of many other unusual characteristics. Perhaps most striking is the fact that the compound is composed entirely of carbon and nitrogen atoms, unlike ninety-nine per cent or more of the known organic compounds, which contain hydrogen.

Dr. Cairns stated that tetracyanoethylene possessed properties shared by *none* of the other chemical groupings included in the Alder substituents. Similarly, Dr. Fieser testified:

"Q. Do you consider that this was a material the properties or

characteristics of which could have been predicted by skilled chemists from looking at the formula or the name on a piece of paper?

"A. No, I certainly don't think so at that time without any knowledge of the compound or even closely related compounds. I don't think one could have predicted the substance was capable of existence. * * *"

■ It seems clear, therefore, that tetracyanoethylene differs in kind, rather than merely in degree, from the general Alder formula or any of its other possible substituent combinations. Consequently, on this additional ground, the prior patent would not be an anticipation sufficient to preclude the granting of letters patent on the instant application.[8]

*Claim 3.*

While claims 1 and 3 were dealt with jointly by the Patent Office tribunals, the District Court correctly considered the claims separately, noting that claim 1 was the broader, while claim 3 was limited to an "essentially pure compound." The court went on:

"Counsel [for the Patent Office] admits that the Alder et al patent does not suggest the claimed properties set out in claim 3. Furthermore, both parties agree that the properties expressed in claim 3 are not predictable, and that such properties could be ascertained only after successfully producing the compound."

Notwithstanding, the court held:

"[I]n accordance with the holding in National Lead Co. v. Marzall, 91 U.S.App.D.C. 63, 198 F.2d 296, an increase in knowledge of a prior disclosure or the discovery of new properties thereof does not justify the grant of a patent."

While we do not dispute the District Court's interpretation of the *National Lead* decision, we feel that case is not applicable here. In the *National Lead* case, the patent applicant was seeking to patent a drilling fluid having a certain combination of chemical ingredients which would determine its viscosity. In affirming the denial of letters patent, this court pointed out that well-drilling fluid containing the ingredients included in the application was known, and that the mere novel proportion of the chemical additives was insufficient to warrant a patent. Roberts v. Ryer, 91 U.S. 150, 23 L.Ed. 267 (1875), cited in the *National Lead* opinion, dealt with a slight modification of the design of a refrigerator, also a well-known product.

■ Hence those cases are not controlling where, as here, a novel or unique product is involved. It is significant that, while the Primary Examiner stated that the properties recited in claim 3 were inherent in the compound suggested by Alder, the District Court found as a fact that there was not the slightest suggestion of these properties in the Alder patent. We hold that the District Court's finding on this point compelled a result contrary to that which the court reached, for the same reasons set forth *supra* relating to claim 1.

II

The second major issue, raised by appellees after the trial and urged on appeal, is that claim 1 does not meet the standard of particularity required by 35 U.S.C. § 112,[9] and hence is not patentable. In short, appellees argue that the word "tetracyanoethylene" does not define an invention within the meaning of the statute. We think that a contrary conclusion is compelled.

■ Preliminarily, it should be noted that the so-called "Geneva" system of nomenclature, from which the name

8. Cf. Application of Papesch, 315 F.2d 381, 50 CCPA (Patents) —— (1963); Mathieson Alkali Works, Inc. v. Coe, 69 App.D. C. 210, 99 F.2d 443 (1938); Rem-Cru

Titanium, Inc. v. Watson, 147 F.Supp. 915 (D.D.C. 1956).

9. Note 5, *supra.*

tetracyanoethylene is derived, is a standard system of identification for various chemical compounds. The compound here involved is called an ethylene, or derivative of ethylene, because of the central nucleus of the two carbon atoms $(C=C)$; the tetracyano part of the name means that four cyano $(CN)$ groups are attached to the ethylene nucleus. It seems, therefore, that the word tetracyanoethylene is little more than the structural formula of the compound converted into an utterable combination of letters. We do not understand appellees to assert that a chemical formula would not adequately describe a compound claimed in a patent application, and since it seems apparent that the name here is as equally descriptive of the compound as a line-and-symbol formula, it is as sufficient for purposes of statutory particularity.[10]

██ More important, however, the ultimate factor controlling a question of the sufficiency of a claim is well stated in Application of Nelson, 280 F.2d 172, 181, 47 CCPA (Patents) 1031, 1045 (1960):

"The descriptions in patents are not addressed to the public generally, to lawyers or to judges, but, as section 112 says, to those skilled in the art to which the invention pertains or with which it is most nearly connected. The sufficiency of a specification must be tested in the light of this fact and judged by what it conveys to those who *are* skilled in the art."

In the District Court proceedings, uncontroverted expert testimony established that the name of the compound tetracyanoethylene did describe the compound, and that one skilled in the art

would understand what was indicated by the use of the name.[11] Consequently, we are of the opinion that claim 1 is not defective for lack of statutory particularity.

For the above reasons, the order of the District Court must be reversed, and the case remanded to that court with instructions to enter an order authorizing the Commissioner of Patents to issue a patent to appellant on Claims 1 and 3.

So ordered.

EDGERTON, Senior Circuit Judge, dissents.

---

10. We are also persuaded somewhat by the history of the Patent Office in granting letters patent for application claims having the same descriptive nature as claim 1 herein.

11. E. g., by Dr. Fieser:
"Q. * * * In your opinion, is the naming of a compound per se and only that a sufficient and proper identification of that compound?

* * * * * * *
"A. Well, it depends. Are you talking about tetracyanoethylene?
"Q. I will ask you that question directly. Is that a sufficient and complete definition of a new product?
"A. Either the name or the formula in that case, it seems to me, is a sufficient description."