**DEUTSCHE GOLD–UND SILBER-SCHEIDEANSTALT VORMALS ROESSLER, Plaintiff,**

v.

**COMMISSIONER OF PATENTS, Defendant.**

**Civ. A. No. 3012–63.**

United States District Court
District of Columbia.

Feb. 8, 1966.

Jennings Bailey, Jr., Hugo Huettig, Jr., Bailey, Stephens & Huettig, Washington, D. C., for plaintiff.

Raymond E. Martin, Solicitor's Office, U. S. Patent Office, Washington, D. C., for defendant.

JACKSON, District Judge.

This is a civil action under 35 U.S.C. § 145 in which plaintiff, assignee of Schuler et al. patent application Serial No. 56,702, entitled "Thiophenylpyridyl Amine, Chlorothiophenyl-Pyridyl Amine, Their Salts and Preparation", seeks an

adjudication that it is entitled to receive a patent for the invention specified in Claims 1 and 2 of said application.

Claim 1 of the application reads as follows:

1. A thiophenylpyridyl amine compound selected from the group consisting of compounds of the formula

wherein X is selected from the group consisting of H and chlorine, their hydrochlorides and their sulfates.

Claim 2 is directed to the specific thiophenylpyridyl amine compound of claim 1 wherein X is hydrogen. This chemical species is also identified as 1-azaphenothiazine. Claim 3, directed to a process for production of the compounds of Claim 1, was withdrawn from this action prior to trial.

■ Plaintiff's application Serial No. 56,702, filed September 19, 1960, is a division of parent application Serial No. 537,896 (now U. S. Patent No. 2,974,-139), filed September 30, 1955. During prosecution of the parent application priority under 35 U.S.C. § 119 of a German application filed October 2, 1954 was claimed. Although priority of the original German application was not claimed for the divisional application in suit, it is nevertheless entitled under 35 U.S.C. §§ 120, 121 "to the benefit of the filing date of the original application" which, according to 35 U.S.C. § 119, is October 2, 1954, the original German filing date, which is also the date of invention for the invention of the divisional case under 35 U.S.C. § 104.

Defendant contends that the claimed subject matter, and particularly 1-azaphenothiazine, is unpatentable under 35 U.S.C. § 103 since "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made (October 2, 1954) to a person having ordinary skill in the art to which said subject matter pertains."

Although other references were relied upon by the Patent Office in rejecting process claims which are not now before the Court, the four references relied upon by defendant in rejecting product Claims 1 and 2 are as follows:

Rath    2,789,978    April 23, 1957
Chemical Abstracts Decennial Index, 1937-1946, page 8415 (1949)
Petrow et al.—Journal Chemical Society, 1945, pages 591–593
Takahashi et al.—Pharmaceutical Bulletin (Japan), Vol. 2, pages 382–8 (1954)   .

The Chemical Abstracts Index discloses the names and structural formulas of various chemical compounds without any indication as to their properties or utilities. The parties agree that this reference discloses substituted 3-azaphenothiazines. Defendant also contends that the references disclose the structural formula of unsubstituted 3-azaphenothiazine, which is a ring position isomer of plaintiff's claimed 1-aza compound. However, no literature reference is provided in the index for the unsubstituted 3-azaphenothiazine, which indicates clearly that the structural formula of this 3-aza isomer is listed in Chemical Abstracts only for indexing purposes. The reference also discloses the structural formulas of 1-, 2-, and 3-azaphenoxazines. The 1-aza compound is the oxygen analogue of plaintiff's claimed 1-azaphenothiazine, with oxygen substituted in place of sulfur.

The Petrow et al. article discloses the synthesis of 3-azaphenothiazines as well as the fact that "biological examination of these new azaphenothiazines * * * did not reveal any outstanding activity". In discussing the process of preparation analogous to that which plaintiff used for synthesis of its claimed 1-aza isomer, Petrow et al. said that "we were not

able to convert any of these diphenylamine analogues into the azaphenothiazines by the known standard methods." Lastly, the reference article states that two substituted 3-azaphenothiazines were "too insoluble to give results of value", when tested for "therapeutic activity".

Takahashi et al. disclose substituted 2-azaphenothiazines by name, but both parties agree that, according to the system of nomenclature commonly used in the United States, these reference compounds are really substituted 4-azaphenothiazines. Takahashi et al. likewise do not indicate any therapeutic activity, effects, properties or utilities for their substituted 4-aza compounds.

Rath discloses in Example 15 of his patent the compound 1,9-diazaphenothiazine, which is the diaza analogue of plaintiff's 1-monoaza compound. Rath is the only one of the four references relied upon by the defendant which provides some indication of therapeutic utility for the disclosed compounds, which are said "to be distinguished by relatively low toxicity and valuable physiological effects based on their capacity of stabilizing the vegetative and central nervous system, accompanied by essentially reduced side effects".

None of the references broadly or specifically disclose plaintiff's claimed 1-azaphenothiazines, and it is undisputed that, according to the record in this case, the compounds were new at the time of the invention, October 2, 1954.

Defendant contends that the four references, when combined, suggest at least the structural formula, if not the pharmacological properties and utilities of plaintiff's claimed unsubstituted 1-aza isomer.

Plaintiff accordingly bases its case on the existence of unexpected beneficial properties in the claimed compounds which serve to overcome any presumption that the compounds themselves were obvious due to the fact that their structural formulas were obvious in view of the prior art references at the time of the invention.

In this regard divisional application Serial No. 56,702 in suit contains the following utility disclosures:

"The new compounds can be directly used as medicaments, such as, for example, as vermicides, furthermore they are valuable intermediates for the production of pharmaceuticals, such as in the production of the N9-dimethyl amino isopropyl thiophenyl pyridyl amine, by reaction with dimethyl amino isopropyl chloride as described in copending application Serial No. 537,896, filed September 30, 1955, now U. S. patent No. 2,-974,139, of which this application is a division".

Parent application Serial No. 537,896, the disclosures of which are incorporated by reference in the divisional application, contains the following additional utility disclosures:

"the new compounds according to the invention are valuable intermediates for the production of pharmaceuticals and can also be directly used as medicaments, for example, as vermicides, sedatives, narcotics, anti-allergy compounds and sympathomimetic compounds".

With regard to the direct utility of plaintiff's claimed compounds as vermicides (anthelmintics), plaintiff introduced evidence which shows that the claimed 1-azaphenothiazine possesses more than one hundred times the anthelmintic effect on ascaris worms of unsubstituted 4-azaphenothiazine, the structural formula of which is suggested by Takahashi et al. The evidence also shows that the unsubstituted 2 and 3-azaphenothiazines have essentially the same anthelmintic activity as the 1-aza ring position isomer of Claim 2 and that the 1-aza compound is the least toxic of the four ring isomers.

■ Defendant attacks plaintiff's evidence of relative anthelmintic activity of the four isomers on the ground that the tests were conducted *in vitro* rather than *in vivo*, i. e., that the compounds were tested on ascaris worms in solution

rather than in the intestines of living animals. In view of the facts that the claimed 1-aza isomer was equal or greatly superior in anthelmintic activity to the other three unsubstituted isomers according to the *in vitro* test, that this test was shown to be internationally used and recognized, that the 1-aza compound proved to be the least toxic of the four isomers in toxicity tests on mice, and that the claimed 1-aza isomer is effective as an anthelmintic agent in living animals according to University Veterinary Department tests, the Court is of the opinion that it is reasonable to conclude that the 1-aza isomer would also be equal or superior as a vermicide to the other three isomers in *in vivo* tests as well as in *in vitro* tests. More importantly, none of the prior art references relied upon by defendant contains the slightest suggestion that any azaphenothiazine would have sufficient anthelmintic activity to be effectively useful as a vermicide. When the prior art does not contain the slightest suggestion that the properties of a claimed compound would make it useful for a certain advantageous purpose, then the utility itself is unobvious, and it is unnecessary for an applicant to prove by comparative tests that his compound is more useful for the certain purpose than closely related prior art compounds. See E. I. Du Pont de Nemours and Company v. Ladd, 117 U.S. App.D.C. 246, 328 F.2d 547 (1964); In re De Lajarte, 337 F.2d 870, 52 CCPA 826 (1964).

■ When the inherent existence of a certain beneficial utility in a claimed compound is itself unobvious, a requirement that an applicant must additionally show that his compound is unexpectedly more useful in comparison with prior art compounds would amount to a requirement to prove "advance in the art", which is not a condition for patentability under American Patent Law. 35 U.S.C. §§ 101–103.

In addition to disclosures in the originally filed specification that the claimed compounds were directly useful as vermicides, plaintiff's assignors also disclosed the compounds to be indirectly useful as intermediates in the preparation of pharmaceuticals, which derivatives are disclosed in parent application No. 537,-896 to have "anti-histaminic activity", and to be further useful as "sedatives". Plaintiff has compared the sedative effect on mice of the corresponding 3-dimethylaminopropyl derivatives of the four azaphenothiazine ring position isomers and has introduced evidence to show, *inter alia,* that the 1-aza derivative, which is known by the trade name "DOMINAL", has twice the sedative effect of the corresponding 4-aza derivative and five times the sedative effect of the corresponding 3-aza derivative. Plaintiff has also compared the antihistaminic activity of the corresponding N-dimethylaminoisopropyl derivatives of the four ring isomers and has introduced evidence to show that the 1-aza derivative, which is known by the trade name "ANDANTOL", has twice the antihistaminic activity of the corresponding 3-aza derivative and four to five times the antihistaminic effectiveness of the corresponding 2- and 4-aza derivatives.

Defendant attacks these showings of unexpectedly greater pharmacological effects of the derivatives of the claimed 1-aza isomers on the ground that proof of unexpected beneficial properties in derivative compounds is not the best evidence of unexpected advantageous properties in the claimed compounds themselves, citing In re Druey et al., 319 F.2d 237, 50 CCPA 1538 (1963).

In the *Druey* case the sole use disclosed in the specification for the claimed compound was as an intermediate for the preparation of a new sulfa drug. Although evidence was introduced to show that the sulfa drug II prepared from the claimed intermediate I possessed unexpected beneficial properties in comparison with the sulfa drug IV prepared from the reference compound III, this evidence was considered by the Court majority to be "too remote" to have a bearing upon the patentability or the properties of the claimed intermediate I itself.

Since elimination of the methyl group from the pyrazole ring of sulfa drug IV, or in the alternative, substitution of a methyl group at the 5-position of the pyrazole ring in sulfa drug II would have resulted in the production of identical compounds with identical structural formulas and, necessarily, identical properties, the scientific fact cannot be ignored that any differences in properties between sulfa drugs II and IV must be attributed to the presence or absence of a methyl group at the 5-position of the pyrazole ring. Since this is the identical structural difference between claimed intermediate I and reference compound III, it would appear that the evidence in the *Druey* case suffices to show that the claimed compound I would be more useful as an intermediate in the preparation of sulfa drugs than reference compound III.

While the majority opinion in *Druey* is correct to the extent that evidence of unexpected advantageous properties of derivatives of a claimed compound is not the "best evidence" of unexpected beneficial properties of the claimed compound itself, it would appear that, since no use for the claimed compound other than as an intermediate was disclosed in the specification as originally filed, direct evidence of unobvious beneficial properties of the claimed intermediate would not have been admissible according to the doctrine of In re Herr, 304 F.2d 906 (CCPA 1962). Therefore it would appear that the dissenting opinion of Judge Smith is also correct to the extent that the "best evidence" of unexpected beneficial properties which was admissible as a matter of law in the *Druey* case was evidence of unexpected advantageous properties of the sulfa drug II derived from the claimed intermediate I.

In any event, decisions of the U. S. Court of Customs and Patent Appeals, while often persuasive, are no more binding on this Court than are decisions of this Court binding on that one. In fact, where decisions of the U. S. Court of Customs and Patent Appeals are in conflict with precedents of the District Court and U. S. Court of Appeals for the District of Columbia, the precedents of the U. S. Court of Customs and Patent Appeals may be, and in some cases must be, respectfully disregarded. Reynolds v. Aghnides, 356 F.2d 367 (D.C.Cir. 1966).

Judge Smith's dissenting opinion in *Druey* cites with approval the decision of Judge Letts in Parker v. Marzall, 92 F.Supp. 736 (D.C.D.C.1950), wherein evidence of unobvious advantages of yellow azo pigments prepared from claimed compounds in comparison with pigments prepared from a prior art compound which was the next adjacent homologue of one of the claimed compounds, was held to be proper evidence as to unexpected beneficial properties possessed by the claimed compounds themselves.

While Parker v. Marzall was not specifically cited, its rationale was applied in the recent decision of this Court in Union Carbide Corporation v. Brenner, 239 F.Supp. 923 (D.C.D.C.1965) wherein the Court held that any presumption of obviousness was overcome by evidence which showed that the claimed compound produced a thermoplastic resin upon reaction with adipic acid, while the prior art compound in contrast formed a thermoset resin upon reaction with adipic acid. In addition to these two District Court precedents, the Court of Appeals for this Circuit held in Du Pont v. Ladd, supra, that one of the "extraordinary properties" of tetracyanoethylene was that "it reacts uniquely with certain aromatic solvents to produce various color complexes", which complexes are then directly useful as "strong permanent dyes for synthetic fibers". 328 F.2d at 549, 553.

While defendant attempts to distinguish the *Du Pont* case on the ground that an anticipation rejection under 35 U.S.C. § 102 was involved therein, whereas the present rejection is one of obviousness under 35 U.S.C. § 103, this attempted distinction appears to the Court to have been satisfactorily answered for chemical patent cases by the Court of

Customs and Patent Appeals in In re Brown, 329 F.2d 1006 (CCPA 1964).

It is further noted that in the *Du Pont* case, wherein the Court of Appeals reversed both this Court and the Patent Office Board of Appeals, the structural formula of the claimed compound, tetracyanoethylene, was broadly disclosed in a single prior art patent. In contrast, none of the prior art references in the present case broadly or specifically discloses even the structural formula of plaintiff's claimed compound, 1-azaphenothiazine.

To the extent that the structural formula of unsubstituted 1-azaphenothiazine may be regarded as suggested or rendered obvious by the combined disclosures of the prior art references, none of these references, singly or in combination, suggests that the claimed 1-aza isomer would be directly useful as a vermicide or that derivatives of this claimed intermediate would be useful as either sedatives or antihistaminics.

■ In comparing the properties of the claimed 1-aza compound and its derivatives with those of the isomeric 2-, 3-, and 4-azaphenothiazines and their corresponding derivatives, plaintiff has not compared its 1-monoaza isomer with the 1,9-diaza analogue of Rath. In this regard, plaintiff introduced much evidence in the form of prosecution affidavits and trial testimony in an attempt to prove that Example 15 of the Rath patent was inoperative. The law on this subject is clear to the effect that "the invention disclosed in a patent is presumed to be operative because the patent enjoys a statutory presumption of validity, 35 U.S.C. § 282, and operativeness is a prerequisite to validity, 35 U.S.C. § 101." In re Spence, 261 F.2d 244, 46 CCPA 722, cited in In re Jacobs et al., 318 F.2d 743, 50 CCPA 1316 (1963).

■ One who asserts the invalidity of a patent cited as a reference against his application not only has the statutory burden of proof under 35 U.S.C. § 282, but must prove invalidity beyond a reasonable doubt, since the reference patentee is not present in Court to defend the validity of his patent against such a collateral attack.

Since Widiger U. S. patent No. 2,360,295, cited by the Patent Office against plaintiff's process claims, suggests the use of as much as 200% excess amine in the attempted reaction between dipyridylamine and sulfur to produce 1,9-diazaphenothiazine, and since the maximum excess of amine in plaintiff's attempts to duplicate Example 15 of the Rath patent was only 27%, the Court holds that plaintiff has failed to prove inoperativeness and resultant invalidity of the Rath patent beyond a reasonable doubt. Therefore Rath (application filed July 15, 1954) is available as a reference for all that it teaches or suggests. Although plaintiff did not compare its claimed 1-monoazaphenothiazine with the 1,9-diaza analogue of the Rath patent, due to plaintiff's inability to prepare this 1,9-diaza analogue, the Court holds that this is not detrimental to plaintiff's case since the 2-, 3-, and 4-monoaza isomers, which were actually compared with the claimed 1-monoaza isomer, are more closely related structurally to the claimed compound than is the 1,9-diazaphenothiazine of Rath.

■ An applicant for patent need not compare the properties of a claimed compound with those of all closely related compounds whose structural formulas and beneficial properties are taught or suggested by the prior art, it being sufficient if the beneficial properties of the claimed compound are compared with the corresponding properties of the most closely related prior art compounds. In the present case the compounds which are most closely related to plaintiff's compound, 1-monoazaphenothiazine, would be the unsubstituted 2-, 3-, and 4-monoaza ring position isomers, not the 1,9-diaza analogue of the Rath patent or the phenoxazine analogues of Chemical Abstracts.

■■ Plaintiff has introduced trial evidence as to the substantial commercial success achieved by the "DOMINAL" and "ANDANTOL" derivatives of its

claimed 1-azaphenothiazine intermediate. Since evidence of commercial success is traditionally considered in patent cases only in resolving doubts as to obviousness in favor of either applicants for patents or patentees, and since the rule of law is now clear that "in trials *de novo* under 35 U.S.C. § 145 in the District Court, doubt as to patentability is to be resolved not in favor of the applicant, but in favor of the correctness of administrative action" by the Patent Office tribunals, Reynolds v. Aghnides, supra, it would appear that commercial success is no longer a factor to be considered in civil actions under 35 U.S.C. § 145. However, in the present case the Court has no doubt whatsoever as to the unobviousness and patentability of plaintiff's claimed 1-azaphenothiazines of Claims 1 and 2 of Schuler et al. application Serial No. 56,702, and therefore the decision by the Patent Office Board of Appeals cannot be sustained. The Court concludes that plaintiff is entitled to receive a patent for the invention specified in Claims 1 and 2 of the Schuler et al. application, and will authorize the Commissioner to issue such patent on compliance with the requirements of law.

The above Opinion contains Findings of Fact and Conclusions of Law.