1.

**Stephen E. FREEMAN, Gordon W. Gottschalk, and Freeman Chemical Corporation, Plaintiffs,**

**v.**

**Edward J. BRENNER, Commissioner of Patents, Defendant.**

**Civ. A. No. 1079-64.**

United States District Court
District of Columbia.

April 5, 1966.

Norman M. Shapiro, Owen J. Murray, Jr., Merriam, Marshall, Shapiro & Klose, Chicago, Ill., Joseph A. DeGrandi,

**40**

Browne, Schuyler & Beveridge, Washington, D. C., for plaintiffs.

Joseph Schimmel, Sol., U. S. Patent Office, Washington, D. C., Raymond E. Martin, Washington, D. C., of counsel, for defendant.

JACKSON, District Judge.

This is a civil action under 35 U.S.C. § 145 in which plaintiffs seek to obtain a patent for their invention of using acid catalyzed thermosetting furfuryl alcohol resins as binding agents in foundry sand cores used in the casting of molten metals. Upon review of all the evidence, old and new, in the case, as well as the briefs of counsel, the Court finds for the defendant and against plaintiffs, who are not entitled to a patent on the claimed subject matter.

During the trial of this action, plaintiffs introduced evidence in an attempt to establish the inoperability of the subject matter disclosed and claimed in Treat et al. U.S. No. 2,999,829, granted September 12, 1961 on an application filed June 25, 1954, nearly one and one-half years prior to plaintiffs' application filing date of December 2, 1955. Treat et al. is one of the two primary references relied upon by the Patent Office tribunals in rejecting the claims of the application in suit.

In addition to the evidence presented at the trial, which for the most part is clear and convincing as to at least the impracticality, and probably the commercial inoperability of most of the Treat et al. subject matter, plaintiffs also rely on the recent Supreme Court Opinion in the case of United States v. Adams, 86 S.Ct. 708, 714 (1966), wherein the Court was persuaded by "the unchallenged testimony that the Skrivanoff formulation was both dangerous and inoperable." In the present case, plaintiffs' witness Cowles similarly testified to the danger involved in his attempt to duplicate the work described in the Treat et al. patent examples, as follows:

"As an example, not knowing that there would be anything but a workable solution here, we started with Example IV, which contains all of the ingredients, the additives, and surprisingly we had such an explosive result that I lost a suit of clothes. From then on we had to be much more careful with the amounts that we used. And we got explosions. That is, the materials blew right out of the container all over the room in every case but one. In Example I we just got a highly viscous material which was unusable within an hour or two."

■ On the basis of such clear and convincing evidence, the Court would normally be inclined to hold that the Treat et al. patent had been removed as a reference, except for the fact that Treat et al. is an unexpired American patent, which enjoys a mandatory statutory presumption of validity under 35 U.S.C. § 282, and operativeness is a prerequisite to validity under 35 U.S.C. § 101. In re Jacobs et al., 318 F.2d 743, 50 CCPA 1316 (1963). In contrast, the Skrivanoff reference in the *Adams* case was an expired British patent which had been granted in 1880. Adams v. United States, 330 F.2d 622, 631 (Ct.Cl.1964).

■ This Court recently had occasion to consider the degree of proof which should be required of a plaintiff in a civil action under 35 U.S.C. § 145 who asserts the invalidity of an unexpired American patent cited as a reference against his application. In Deutsche Gold und Silber-Scheideanstalt, etc. v. Commissioner of Patents, 251 F.Supp. 624 (D.C.1966), the Court held that the plaintiff "not only has the statutory burden of proof under 35 U.S.C. § 282, but must prove invalidity beyond a reasonable doubt, since the reference patentee is not present in Court to defend the validity of his patent against such a collateral attack." No reason is seen at this time to depart from that rule, at least insofar as an unexpired American patent like Treat et al. is concerned.

The Court is not convinced beyond a reasonable doubt of the commercial inoperability of the Treat et al. subject matter, due to the following conclusion

expressed in the Cowles Affidavit (plaintiffs' Exhibit 19):

"(c) The liquid binder composition of Example I of the Treat et al. patent was more stable than the other examples of the patent, however, its viscosity markedly increased to an unusable state within about 6 hours. Example VII of the patent describes a binder-sand mix that can be prepared in commercial quantities without producing a violent reaction, provided the violently unstable liquid binder composition of the mix is not prepared in the absence of sand."

The proviso that the unstable composition should not be prepared in the absence of sand is fully satisfied by the terms of Treat et al. Example VII, which reads in part as follows:

"The dry materials (including inter alia sand and maleic anhydride, the acidic catalyst) were first mixed in a Hobart food mixer and then the furfuryl alcohol was mixed. The average strength of cured tensile briquets blown with the above sand mix in a Redford core blower was 252 p. s. i."

With regard to the "tensile briquets" of Example VII, plaintiffs contend that the reference patent is concerned only with the production of foundry shell molds for metal casting, but not with foundry cores. Plaintiffs' witness Cowles testified at the trial that "a tensile briquet looks like a dogbone." Example 1 of Vincent U.S. No. 2,534,743 (defendant's Exhibit 4) describes the preparation of "sand cores in dogbone shape," which are tested for "tensile strength." Therefore, the Court believes it reasonable to conclude that the "tensile briquets" of Treat et al. Example VII are "sand cores." It is further noted that the Examiner's Answer of June 28, 1963, contains the argument that "such briquets are inherently cores." Also, the accepted definition of a foundry "core," according to Webster's Seventh New Collegiate Dictionary, is "the portion of a foundry mold that shapes the interior of a hollow casting." Thus it is evident that

Treat et al. relates to foundry cores, as well as shell molds.

As stated in their patent, the Treat et al. invention concerns "employing the controllable initiation of the rapid resinification reaction" of furfuryl alcohol in the presence of maleic acid or its anhydride. The patentees set forth the prior art knowledge as follows:

"It has been known in the art that various liquid furane derivatives (including furfuryl alcohol) could be caused to undergo resinification reactions by catalysis with small additions (1 to 2 percent by weight) of mineral acids. The resinification reactions thus induced were rapid, highly exothermic, and practically uncontrollable once initiated, yielding black, porous, infusible resinous solids of little practical value. Considerable effort has been expended in seeking to modify the rate of the polymerization reactions by use of milder, less active catalysts than mineral acids such as organic materials (U.S. Pat. 2,432,890) * * *."

The "organic materials" which Treat et al. elected to use as "milder, less active catalysts" are maleic acid and its anhydride. Plaintiffs contend that the above excerpt teaches away from their use of mineral acids as furfuryl alcohol resinification catalysts. In a sense it does, and the statement was probably drafted for exactly that purpose by inventors Treat et al. or by their patent agent or attorney. The accepted manner of drafting patent specifications involves playing down the prior contributions of others in the field. This serves, hopefully, to emphasize, by vivid contrast, the alleged superiority of an invention presently being claimed over prior inventions.

The fact that Treat et al. typically overstated the case with respect to the prior art is evident from examination of Example 1 of Adams et al. U.S. 2,471,600, wherein the allegedly "practically uncontrollable" resinification reaction of furfuryl alcohol in the presence of sulfuric acid, a strong mineral acid catalyst, was readily controlled by the repeated addi-

tion of water. At the point at which the proper viscosity of the initial resin was obtained, the reaction was promptly "quenched" by the addition of water and sodium hydroxide to neutralize the sulfuric acid catalyst.

In view of the general rules of chemistry that (1) strong mineral acids are usually more effective, as acid catalysts, than weak carboxylic acids, and that (2) chemical reaction rates generally increase at elevated temperatures, it would be obvious to a person having ordinary skill in the synthetic resin art that the reaction rate of the acid catalyzed resinification of furfuryl alcohol described in both the Treat et al. and Adams et al. patents could be modified to a considerable extent by appropriate selection of acid catalysts and reaction temperatures. Anyone who desired to obtain a rapid reaction rate would naturally be led to use strong mineral acid catalysts such as are specifically disclosed in Adams et al. and used by plaintiffs. Since the Treat et al. patent warns those having ordinary skill in the foundry art that the mineral acid catalyzed resinification reactions are "practically uncontrollable once initiated," any persons taking this statement literally would naturally use a mixing procedure such as that set forth in Example VII of Treat et al. In other words, the mineral acid would not be directly mixed with furfuryl alcohol in the absence of sand, since this would initiate a "practically uncontrollable" reaction, and the "black, porous, infusible resinous solids" could hardly be effectively mixed with the foundry sand after completion of such resinification reactions.

Plaintiffs also contend that Treat et al. disclose only a "reaction" of furfuryl alcohol with maleic acid or anhydride, not the use of the maleic "reactants" as acidic catalysts. The nature of the Treat et al. process is apparent from the following excerpt:

"We have discovered that a liquid mixture comprising furfuryl alcohol (2 parts by weight) and maleic anhydride (1 part) maintained at room temperature will undergo only slow conversion to viscous or solid resin, yet may be very rapidly converted to a rigid solid by heating to temperatures about that of boiling water."

Since the formula weights of furfuryl alcohol and maleic anhydride are both 98, according to Lange's Handbook of Chemistry, the parts by weight set forth above would be exactly the theoretical amounts required for the desired preparation of monomeric difurfuryl maleate ester, in accordance with the following teaching · from Kirk-Othmer, "Encyclopedia of Chemical Technology," Vol. 6, p. 1003 (plaintiffs' Exhibit 11):

"As a primary alcohol, furfuryl alcohol can be used for esterification of various carboxylic acids. However, because it readily resinifies in the presence of strong acids, esterification is best carried out by the comparatively mild techniques of ester interchange."

Since Treat et al. did not resort to ester interchange, it is not surprising that their attempted esterification, even in the presence of the 50% excess alcohol which they preferred, did not proceed to completion and a small catalytic amount of the maleic acid or anhydride always remained unesterified, as evidenced by the above statement of "slow conversion to viscous or solid resin," even when the reaction mixture was "maintained at room temperature". In this regard, plaintiffs' evidence of the instability of the liquid binder systems of most of the Treat et al. examples merely indicates that the maleic acid (or anhydride) catalyzed resinification of furfuryl alcohol proceeds more rapidly at room temperature than one might expect from reading the patent disclosures. Thus the black, porous, infusible furfuryl alcohol resins pictured in plaintiffs' Exhibits 14 to 17 are apparently produced quite rapidly from the allegedly "metastable" liquid binder systems of Examples II to V and VIII of Treat et al.

█ In arriving at the conclusion that the subject matter claimed by plaintiffs is obvious and unpatentable over Treat et

al. in view of Adams et al. under 35 U.S.C. § 103, the evidence of commercial success has been fully weighed. In this regard, the Court recently expressed the dictum that, in view of the decision by the Court of Appeals for this Circuit in Reynolds v. Aghnides, 356 F.2d 367 (D.C. Cir.1966), "it would appear that commercial success is no longer a factor to be considered in civil actions under 35 U.S.C. § 145". Deutsche Gold und Silber-Scheideanstalt, etc. v. Commissioner of Patents, supra, D.C., 251 F.Supp. at 631. However, a subsequent decision by the Court of Appeals has clarified the matter, and the rule that commercial success is a material, but not controlling, factor in a civil action under 35 U.S.C. § 145 is still fully in effect. California Research Corp. v. Ladd, 356 F.2d 813 (D.C.Cir. 1966).

Pursuant to F.R.Civ.P. Rule 52(a), the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. This is a civil action under 35 U.S.C. § 145 in which the plaintiffs, Stephen E. Freeman, Gordon W. Gottschalk and Freeman Chemical Corporation, seek to have the Court authorize the Commissioner of Patents to issue to the Corporation a patent containing claims 50 through 57 of the Freeman and Gottschalk application Serial No. 550,779, filed December 2, 1955, entitled "Method and Compositions for the Production of Refractory Structures for Metal Casting." The application is assigned to the Corporation.

2. The invention described in the aforementioned application relates to a foundry core composition which includes, besides sand (the usual refractory base), a furfuryl alcohol binder and an acid catalyst for the binder. The composition includes the binder in an amount up to 5.5% by weight. The catalyst is effective to cure the binder in a brief period when heat is applied, and over a longer period at room temperature. The invention also relates to a method of producing foundry cores of such composition.

3. Claim 56 is representative and reads as follows:

56. An essentially solid, hardenable, moldable, self-curing, porous, foundry core mix, which consists essentially of a major proportion of refractory foundry sand material and up to 5.5% by weight of a furfuryl alcohol binder and a catalyst for said binder that does not itself undergo permanent change during hardening of said binder, said mix being hardenable without the application of heat into a hard, solid, self-supporting, porous foundry core which is not subject to plastic flow prior to casting, resists erosion and deformation by the molten metal until the metal has set, imparts a true internal contour to the molten metal, obviates excessive gassing and permits the ready escape of gas formed during casting, and collapses after the metal has set.

4. The term "furfuryl alcohol binder" as used in plaintiffs' claims is broad enough, when interpreted in light of the specification definition, to include "reaction products" of furfuryl alcohol and another compound, such as maleic acid or anhydride. The claims do not specify the catalyst used or the amount thereof.

5. The Patent Office Board of Appeals affirmed the Examiner's rejection of Claims 50 through 57 as unpatentable over (a) Staeger U.S. No. 2,433,168, December 23, 1947, in view of the teachings of Adams et al. U.S. No. 2,471,600, May 31, 1949, and Valyi U.S. No. 2,521,614, September 5, 1950; and (b) Treat U.S. No. 2,999,829, September 12, 1961 (filed June 25, 1954) in view of the Adams et al. patent.

6. Staeger discloses a foundry molding composition useful in producing sand molds, especially cores. The binder for the sand is a melamine-formaldehyde resin in an amount constituting approximately 3 to 4% of the mold composition. The composition also includes acidic catalysts such as formic or phosphoric acid for hardening the composition at low temperatures within a short time.

44

7. Adams et al., disclose a synthetic resin composition from which large chemical equipment, such as tanks, towers and pipes, is made. The composition includes a furfuryl alcohol binder, a latent catalyst, and a suitable filler. The resin binder may comprise 25–70% of the composition by weight. The patentee prefers such latent catalyst to a strong acid (which may be employed in conjunction with the latent catalyst) which would cause the binder to set too quickly and provide insufficient time to work the composition. Maleic acid is disclosed as a catalyst for the resinification of furfuryl alcohol, together with such strong mineral acid catalysts as sulfuric and hydrochloric acids, in Table I.

8. Valyi relates to investment compositions used in the precision casting of metals. Such compositions include fine sand, various resins as low temperature binders, and an acid catalyst. The amount of resin used is preferably 2 to 15%, based upon the sand content of the composition.

9. Treat et al. disclose foundry molding compositions which include sand, furfuryl alcohol, maleic acid or anhydride, and optional ingredients such as water, urea, and an inhibitor such as ammonium chloride for increasing the storage life of the composition. During the preparation of the composition, furfuryl alcohol reacts with maleic acid or anhydride. The furfuryl alcohol-maleic anhydride (or acid) content may be as low as 2% based on the weight of the sand. This patent also disclosures as prior knowledge that various liquid furane derivatives (including furfuryl alcohol) could be caused to undergo resinification reactions by catalysis with small additions of mineral acids.

10. The Staeger, Valyi and Adams et al. patents are drawn from analogous arts, all of which involve the use of synthetic resin binders in molding compositions.

11. It would be obvious for a person of ordinary skill in the foundry art to substitute the furfuryl alcohol resin binder of Adams et al. for the melamine-formaldehyde foundry core binder of Staeger in view of the known characteristics of the former resin as a binder for the tensile briquets and foundry shell molds of Treat et al. In making the substitution, it would be obvious to use the proportions of the resin disclosed by Staeger and Treat et al. for foundry molding compositions.

12. The combined teachings of Staeger and Adams et al. make it obvious to a person of ordinary skill in the resin art that a strong acid should be used as a catalyst for furfuryl alcohol, if it is desired to rapidly cure (polymerize) the latter at room temperature.

13. Plaintiffs' discovery that they could cure their composition either in a "hot box" in a matter of seconds or in a "no-bake" system in short periods of time, was not unobvious or unexpected in view of the teaching of Adams et al. that a strong acid such as sulfuric acid will cause their resin to harden spontaneously within a brief period, and of prior art knowledge of the properties and reactions of furfuryl alcohol.

14. The evidence with respect to comparative tests of plaintiffs' and Staeger's compositions involved Staeger's Example 2 only, and ignored Staeger's Examples 3, 4 and 5. There is no basis for assuming that the compositions of the latter examples would not harden at ordinary room temperature as disclosed by Staeger. This evidence is inadequate and insufficient to demonstrate the inoperativeness of Staeger's entire disclosure.

15. The evidence with respect to tests on the Adams et al. 25% minimum furfuryl alcohol composition was not responsive to the Board's rejection based on Staeger in view of Adams.

16. The Treat et al. and Adams et al. patents are drawn from analogous arts, both of which involve the use of furfuryl alcohol resin binders in molding compositions.

17. Since the Treat et al. reaction product of furfuryl alcohol and maleic

acid or anhydride satisfies the definition of the claim limitation, "furfuryl alcohol binder", when read in the light of the special definition given to that term in the plaintiffs' specification, and Table I of Adams et al. shows that maleic acid is a known catalyst for the resinification reaction of furfuryl alcohol, the claims fail to patentably distinguish over Treat et al. in view of Adams et al.

18. It would be obvious in following the disclosure of Treat et al., to replace maleic acid or anhydride with a mineral acid, since it is well known in the resin art, as disclosed by Treat et al., that furfuryl alcohol resin will set rapidly with strong acid at a low temperature, even though Treat et al. prefer not to use this expedient for their own purposes.

19. The evidence with respect to the Treat et al. composition of most of the patent Examples showed that such compositions are unstable and explosive. This type of evidence is without probative value because it ignores the fact that the claims of the application in suit are readable on the "reaction products" of Treat et al.

20. The subject matter of Claims 50 through 57, considered as a whole, would have been obvious, at the time Freeman et al. made their invention, to a person having ordinary skill in the foundry art who had knowledge of the Staeger, Valyi and Adams et al. prior art patents

21. The subject matter of Claims 50 through 57, considered as a whole, would have been obvious, at the time Freeman et al. made their invention, to a person having ordinary skill in the foundry art who had knowledge of the Treat et al. and Adams et al. prior art patents.

22. There is meaningful and clear support in the original disclosure for the language in the claims describing the catalyst: "does not itself undergo permanent change during hardening of said binder". Such language is not new matter, since it is part of the accepted dictionary definition of the term "catalyst."

## CONCLUSIONS OF LAW

 1. Even if a patent has made no impression upon the art, it will be as effective to bar the grant of a new patent as though it had entered into the very life blood of the industry. Siegel v. Watson, 105 U.S.App.D.C. 344, 267 F.2d 621 (1959).

2. Claims 50 through 57 of the application in suit are unpatentable under 35 U.S.C. § 103.

3. Plaintiffs are not entitled to a patent containing any of Claims 50 through 57 of Freeman et al. application Serial No. 550,779.

4. The Complaint should be dismissed.